## HANCOCK PAPER COMPANY

v.

## CHAMPION INTERNATIONAL CORPORATION.

### Civ. A. No. 76–118.

United States District Court,
E. D. Pennsylvania.

Nov. 15, 1976.

Charles Sovel, Philadelphia, Pa., for plaintiff.

Sterling Schoen, Jr., Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

Plaintiff Hancock Paper Co. has filed a Robinson-Patman Act (15 U.S.C. § 13 *et seq.*) claim against defendant Champion International Corp., alleging price discrimination in the selling of certain types of "poly coated" waste paper used in the manufacture of milk cartons. Defendant has counterclaimed for the total amount of Hancock's remaining amount due on their contract, stipulated to be $106,849.11. Plaintiff originally pleaded Sherman and Clayton Act violations, but those claims have been withdrawn without prejudice. Defendant has moved for summary judgment on plaintiff's claim and defendant's counterclaim. For reasons set in the memorandum below, defendant's motion will be granted.

In order to grant summary judgment under Rule 56, Fed.R.Civ.P., the Court must find there are no issues as to the existence of a material fact. All doubts as to the existence of a genuine issue as to a material fact must be resolved against the movant. *First Pennsylvania Banking and Trust Co. v. United States Life Insurance Co.*, 421 F.2d 959 (3d Cir. 1969). Although facts presented by the parties here are disputed, they are not material. Defendant is entitled to judgment as a matter of law even if the disputed facts are viewed in the light most favorable to the plaintiff. Therefore, summary judgment must be granted. *Kao v. Red Lion Municipal Authority*, 381 F.Supp. 1163 (M.D.Pa.1974).

Defendant Champion operates five Dairy Pak plants at which polyethelene-coated paper (also referred to as "polycoated" paper) is made into milk cartons. Champion manufactures the paper at Canton, N. C., and coats it at its extruding plant at Waynesville, N. C. The paper is shipped from Waynesville to the Dairy Pak plants where it is processed into milk cartons, with printing applied there on top of the polycoating.

As the manufacturing process is undertaken, the paper is formed into rolls and excess paper trimmed off before printing. This is "unprinted broke," called "No. 1 broke" by Champion. This is generated at Waynesville and at the Dairy Pak plants. As the manufacturing process continues, printed waste is generated when the cartons are made. This is termed "printed broke," or "No. 2 broke" by Champion. This is generated only in the Dairy Pak plants. According to Hancock, "No. 1" and "No. 2" are Champion's own terms, not used elsewhere in the market. Viewing the facts most favorable to the plaintiff, there is no difference on the open market between printed and unprinted broke. Champion had made these distinctions in its marketing and Hancock's president had been aware of such distinctions since at least 1969 (L. Golen Deposition, pp. 5–8).

Champion itself could not use the printed broke, No. 2, for a variety of reasons, the most important being that it had no bleaching facilities. Since 1973, Champion had not marketed any No. 1 broke, retaining it all for in-house use.

By letter of May 29, 1975, Champion solicited bids for the No. 2 broke which would be generated from July 1 to December 31, 1975, estimated to be 469 tons (Inquiry No. 66–B–5, Plaintiff's Exhibit "D"). The offer specifically referred to the product as "No. 2 (printed), baled, polycoated waste generated in our five Dairy Pak Plants." Plaintiff claims it understood that no No. 1 broke was to be sold on the market, though no statements to that effect at or before contract formation have been shown in letters or indicated in oral depositions. Plaintiff bid $120.00 per ton (Plaintiff's Exhibit "E"), stating it was for "your poly milk waste generated at the five Dairy Pak plants," and specifically referred to Inquiry No. 66–B–5. This was accepted as the high bid by defendant (Plaintiff's Exhibit "F") for broke "as outlined in the subject inquiry."

In July, 1975, both parties agree that David Ball of Champion called David Berkowitz of Hancock and offered him ten carloads of No. 1 broke. (Plaintiff's Memorandum of Law at 6; Affidavit of David B. Ball, Plaintiff's Exhibit "H"). Berkowitz said he would call Ball later. In the meantime, defendant contacted two other companies, Pioneer Paper Stock Division, Container Corporation of America, and Potlatch Forests, Inc. Both submitted bids and Pioneer's was accepted.

Hancock claims that Champion made a second sale of No. 1 broke, consisting of 570 tons from the Dairy Pak plants, without notifying plaintiff or offering it to them. Champion contacted a few potential customers and solicited bids in August, 1975. This resulted in Howard Zuker Associates buying 470 tons for $80.00 per ton and Pioneer paying $105.00 per ton for 100 tons.

Hancock claims that it began encountering marketing problems due to the extra Champion broke on the market. Due to these difficulties, it entered into a fall-back agreement with Potlatch for $130.00 per ton F.O.B., which resulted in a loss for Hancock on the No. 2 broke.

## THE ROBINSON–PATMAN ACT CLAIM

Plaintiff claims that the sale to Howard Zuker Associates violated the Robinson-Patman Act by discriminating against Hancock with respect to price. This discrimination allegedly arose "because [Champion] knew it would be selling the broke to Zuker at a price lower than it was selling to Hancock during the same period that it was selling to Hancock . . . ." (Plaintiff's Memorandum of Law at 22). Plaintiff does not allege that Champion offered a set price which was accepted by Hancock and offered a lower price which was accepted by Zuker. Both prices were admitted to have been set by the buyers, through a bidding process. Instead, the essence of Hancock's claim is that Champion controlled the second bidding process in such a way as to work a "price discrimination" within the meaning of the Act.

■ This Court holds that no price discrimination could be effected in these circumstances and that the Act does not apply. Both processes involved competitive bid-

ding—the seller having no say in the price set and only accepting the highest price offered by buyers. Section 13 bans discrimination in prices and § 13(b) refers directly to the *seller's* price. The price that Zuker paid was the *buyer's* price, having been computed by Zuker in its own evaluation of the market. This cannot be "price discrimination" by the seller, in that the seller has no control over it. The cases under § 13 all deal with prices established by the seller; this Court can find no cases even dealing with a factual situation in which the buyer set the price.

Hancock argues that the bidding was not really "competitive," since the No. 1 broke was not formally offered to all usual prospects by circulating an Inquiry letter. This is true, but it does not constitute a Robinson-Patman Act violation. Champion called a few potential bidders, soliciting bids by phone. There is no difference whether the broke was offered to two or 25 prospective purchasers since Champion still did not establish the price itself. Champion admits that this limited offer was a device to keep the bids high (Ball, deposition at 76–77). The secret offer was designed to offset a sudden drop in prices that might have resulted had it been widely known that a significant extra amount of broke had unexpectedly been placed on the market. Hancock claims that Champion intended this secretive dealing to result in a lower price than Hancock paid. Although Champion may have known the price would necessarily be lower, if Champion had not dealt so discreetly and the presence of the No. 1 had become widely known, the flooded market probably would have experienced sharper price declines than it did. If the bottom had fallen out of the market completely, Hancock would not have ever been able to enter into its fall-back deal. Therefore, although Champion knew it would be getting lower offers for its extra broke than in prior deals for No. 2, it took measures to keep that price as high as possible. This worked to the benefit, not the detriment, of Hancock by minimizing Hancock's potential loss by artificially keeping the price up.

This Court sees no harm addressed by the Act in such actions.

Finally, this situation, even involving just two or three bidders cannot be deemed illegal or else all competitive bidding would have to end. This Court cannot hold that if a bid on a second, similar product offering was lower than the winning bid on a prior offering, it would be illegal. Such a decision would mean the end of the bidding system. Industries that rely on bidding are usually ones in which prices fluctuate greatly. One sale might be high; the next low and so on, up and down. The Act was not designed to freeze prices in bidding. It simply seeks to have persons deal fairly with customers when the seller has control of prices. In industries where the seller cannot dictate prices, bidding acts to enforce fair prices for buyers. If this Court required each bid to at least equal the last bid on a similar product, such a holding would eliminate the flexibility and sensitivity to market charge that the bidding system allows. The bidding system requires price differentials. The Robinson-Patman Act outlaws only anti-competitive discriminations, which are not present here.

█ Finally, Hancock alleges that Champion had a duty to disclose the second sale to Hancock or be guilty of violating the Act. It is unquestioned that the Act allows a seller to select its own customers. Section 13(a) contains a proviso to that effect. *Hartley & Parker v. Florida Beverage Corp.*, 307 F.2d 916 (5th Cir. 1962), only limits the right to select customers when the choice to exclude a former customer exhibits a malicious intent to destroy that customer. Here, no intent was established by Hancock's evidence. The only intent shown in Champion's alleged exclusion of Hancock and other customers was to maintain the high price, not to allow Champion to lower it in favor of one customer at the detriment of another. This Court cannot find any duty to deal under the Act in this situation.

The Court finds, therefore, that plaintiff has not stated a cause of action under the Robinson-Patman Act. The pricing was not

discriminatory. The difference in price was not brought about by the defendant, since it did not establish the price. Its only attempt to control price was one aimed at keeping the price high, which would have been favorable to the plaintiff. Such an action is not barred by the Act. Champion's failure to offer the additional broke to plaintiff was clearly not illegal, since no malicious intent was shown. Therefore summary judgment on this claim must be granted.

## THE CONTRACT COUNTERCLAIM

Champion counterclaims, seeking the amount not yet paid by Hancock on the No. 2 broke. Hancock does not deny that the balance, stipulated to be $106,849.11, remains unpaid.

Plaintiff's first defense is that Champion breached the output contract for all its broke by concealing the marketing of the No. 1 broke. This defense is without merit and the contract must be enforced as written. Hancock first contends that the contract, formed by the Inquiry 66–5–B (a request for negotiation), Hancock's bid (an offer), and Champion's response (an acceptance), covered all the broke that defendant would be marketing, without regard to its printed or unprinted nature, since those distinctions mean nothing on the general market. The Inquiry clearly states that the subject matter of the proposed contract was to be "No. 2 (printed)" broke (Plaintiff's Exhibit "E"). Plaintiff offered to buy "your poly milk waste generated at the five Dairy Pak plants," which might by itself refer also to part of defendant's No. 1 broke. However, the plaintiff's bid specifically referred back to Inquiry 66–5–B. If plaintiff had indeed been bargaining for all broke, regardless of its printed or unprinted nature, it would have requested the No. 1 waste generated at Waynesville also. Due to the specific language of the Inquiry, plaintiff's knowledge of defendant's distinction between No. 1 and No. 2, and plaintiff's incorporation by reference of Inquiry 66–5–B, this Court holds that the contract was only for all No. 2 broke.

Plaintiff argues that its perception that no No. 1 would be marketed, based on defendant's past behavior, is an implied term of the contract. This violates basic contract law. The subjective intent of the parties to a contract is immaterial. They are bound only by their objective manifestations—in this case, the papers that make up the contract. As Judge Learned Hand said in *Hotchkiss v. National City Bank of N. Y.*, 200 F. 287, 293 (S.D.N.Y.1911), *aff'd* 201 F. 664 (2d Cir. 1911); *aff'd* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 and 231 U.S. 60, 34 S.Ct. 22, 58 L.Ed. 121 (1913):

"A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort."

Furthermore, there is no evidence in the record to indicate that Hancock regarded itself as contractually entitled to the No. 1 broke. It consistently acted in accordance with the fact that its contract covered only No. 2. The first ten carloads were offered to Hancock; if it truly regarded its contract as one for all Champion's printed and unprinted broke, Berkowitz would have claimed it as covered by its existing agreement. Instead, when offered a chance to bid he said he would "get back in a few days." (Berkowitz Deposition at 89). Obviously, Hancock regarded this additional broke as requiring a new bid, since Berkowitz said he was later prepared to make one. (Berkowitz Deposition at 103). Therefore, it is clear that even after the contract was formed, Hancock was assuming it covered only No. 2 broke and that a new price would have to be set to get any No. 1 broke.

Since Champion clearly offered to contract only No. 2 broke by Inquiry 66–B–5

and Hancock knew the meaning of Champion's language and acted as if it had a contract for No. 2 only, it is clear there was a meeting of minds. This is not a case of parties laboring under different definitions of the subject matter, as in *Frigaliment Importing Co. v. B. N. S. International Sales*, 190 F.Supp. 116 (S.D.N.Y.1960) where Judge Friendly dealt with two meanings of the word "chicken." There was no ambiguity here, since both sides referred to Inquiry 66–B–5 which covered only No. 2 broke. Hancock knew that No. 2 broke was not all the broke generated by the plants. Hancock was aware of Champion's terminology, even though not used by other sellers.

Plaintiff is correct in terming this an "output" contract. The only "output" covered however is No. 2 broke, not the output of the Dairy Pak plants. The term "output" used by plaintiff in its offer is modified by reference to defendant's bid solicitation covering only No. 2 broke. Thus, an output contract for No. 2 was created and that contract has not been breached by defendant. There is no evidence to show that defendant dealt with others on the No. 2 broke. It was free to deal with others on products not covered by the output contract.

■ Plaintiff alleges that defendant's conduct violated the Uniform Commercial Code's general requirement to deal in "good faith" when it concealed the sale of additional broke. However, this additional broke was not the subject of any existing contract. The parties were bound only as to No. 2 broke; there was no duty to act in any specific way as to No. 1. Defendant's alleged failure to notify plaintiff of the marketing of a different product (in Champion's terms as known and understood by plaintiff) does not affect its good faith status under the No. 2 broke contract. Therefore, since the subject matter of the contract was indicated by both parties to be only No. 2 broke, since plaintiff acted in accordance with such a contract and plaintiff's unexpressed subjective intent cannot alter the clear meaning of the writing, there was no duty of defendant with regard to No. 1 broke.

■ Plaintiff's other defense is that, even if the contract was for No. 2 broke only, the performance of its obligations is excused because of "supervening impossibility" as defined by the Restatement of Contracts, or "commercial impracticability" under § 2–615 of the UCC. Plaintiff claims that the marketing of the additional broke which depressed prices was not foreseeable at the time of the contract. This Court holds that a drop in market prices even if caused by one of the parties, is not a "supervening impossibility" but is merely an "unanticipated difficulty" under the Restatement, § 467. Plaintiff was able to negotiate a fall-back deal, losing some money on it. Section 467 of the Restatement says, "(F)acts existing when a bargain is made or occurring thereafter making performance of a promise more difficult or expensive than the parties anticipate, do not . . . discharge a duty that has arisen." The fact that Hancock did not profit from its contract with Champion does not render its performance impossible. As is clear from Illustration 1 to § 455, the lack of money from an expected source (here, Hancock's expected profits on resale) does not render performance impossible. Therefore, the unanticipated difficulties of resale do not excuse Hancock's performance.

■ The UCC comments to § 2–615 specifically bar consideration of a decline in market price as "commercial impracticability," since "that is exactly the type of risk which business contracts made at a fixed price are intended to cover." Comment 4, 12A P.S. § 2–615. Since both parties bargain for this risk as part of the contract, its occurrence does not alter any duties under it. This is exactly the situation in the case at bar. This Court finds that the problem of the depressed market, even though caused by Champion's marketing of No. 1 broke (which is the view of the facts most favorable to the plaintiff) does not reach the level of severity required to excuse performance under either the Restatement or the UCC. Since a contract for No. 2 broke

was formed with no implied terms, defendant has not breached any its duties and plaintiff's obligations are not discharged, summary judgment for the defendant is granted.