**In re BROOKS SHOE MANUFACTURING CO., INC., et al., Debtor.**

**BROOKS SHOE MANUFACTURING CO., INC., Plaintiff,**

**v.**

**CHESAPEAKE SHOE COMPANY, Defendant.**

**Bankruptcy No. 81–04333G.**
**Adv. No. 81–1955G.**

United States Bankruptcy Court,
E. D. Pennsylvania.

July 13, 1982.

Kathryn R. Heidt, Duane, Morris & Heckscher, Philadelphia, Pa., for debtor/plaintiff, Brooks Shoe Mfg. Co., Inc.

David I. Grunfeld, Steinberg, Greenstein, Gorelick & Price, Philadelphia, Pa., for defendant, Chesapeake Shoe Co.

## OPINION

EMIL F. GOLDHABER, Bankruptcy Judge:

The instant case is before us on the issue of the amount due the debtor by the defendant for goods sold and delivered. We conclude that the defendant is entitled to credits for defective goods and for certain miscalculations made by the debtor and we will, accordingly, reduce the amount that is due the debtor by the amount of the allowable credits.

The facts of the instant case are as follows:[1] On October 23, 1981, Brooks Shoe Manufacturing Company, Inc. ("Brooks") filed a petition for a reorganization under chapter 11 of the Bankruptcy Code ("the Code"). Prior to that time Brooks was in the business of manufacturing footwear. Chesapeake Shoe Company ("Chesapeake") is in the business of purchasing shoes from manufacturers and distributing them to retailers and had been doing business with Brooks prior to the time Brooks filed its petition. In particular, between January 22, 1981, and August 13, 1981, Brooks sold athletic footwear to Chesapeake and correspondingly billed it for a total of $109,511.06. When Chesapeake failed to pay those bills, Brooks filed the instant adversary proceeding against it seeking a money judgment for the goods sold and delivered. Although Chesapeake admitted that Brooks had sold and billed Chesapeake for shoes totaling the above amount,[2] Chesapeake asserted that it was entitled to credits amounting to $172,475.13. Those credits were allegedly due for the late delivery of shoes by Brooks, for posters and catalogues which Chesapeake asserts it is entitled to return, for two orders of shoes which were missing various sizes, for defective shoes which have been returned or will be returned in the future, and for damages for a drop in the market price of Brooks' shoes allegedly caused by the forced sale of Brooks' entire inventory to a third party during Brooks' bankruptcy proceeding.

Before addressing each of Chesapeake's claimed credits, it is necessary to discuss the parties' general practice of when a credit would be given by Brooks to Chesapeake.[3] In general, when Chesapeake received defective goods from Brooks, Chesapeake would prepare a "charge back" on its standard invoice form which it would then send to Brooks. After receiving the "charge back", Brooks would decide whether to authorize the return of the goods. If Brooks authorized the return of the goods, it would notify Chesapeake to ship the goods back to it. Upon receipt and inspection of the returned goods, Brooks would issue an appropriate credit.

## I. CREDIT FOR LATE DELIVERY OF SHOES.

Chesapeake's first claim is for a credit of $20,760.00 because of the late delivery of shoes by Brooks. Both parties agree that Chesapeake ordered shoes from Brooks in January, 1981, which were to be delivered in April, 1981. Those shoes were not delivered until August, 1981.

On this issue, Chesapeake offered the testimony of its president, Daniel Goldfein

---

1. This opinion constitutes the findings of fact and conclusions of law required by Rule 752 of the Rules of Bankruptcy Procedure.

2. In its answer, Chesapeake failed to deny any of the allegations contained in Brooks' complaint and, therefore, those allegations are deemed admitted. *See* Rule 8(d) of the Federal Rules of Civil Procedure made applicable herein by Rule 708 of the Rules of Bankruptcy Procedure.

3. Section 1–205 of the Uniform Commercial Code (hereinafter U.C.C.) provides, in relevant part, that:

(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

. . . .

(3) A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.

Pa.Stat.Ann. tit. 12A, § 1–205 (Purdon).

("Goldfein"), who stated that, in May, 1981, Brooks' vice president of sales, John Benowitz ("Benowitz") contacted him and explained that there would be a delay in the delivery but that the shoes would arrive in June. When the goods failed to arrive, Goldfein stated that he cancelled the order. When the goods nonetheless arrived in August, Goldfein testified that they were too late to sell for that season and that he consequently entered into an oral agreement with Brooks to return the shoes for an appropriate credit. As a result, Goldfein stated that he sent a "charge back" to Brooks in the amount of $20,760.00 for the late shoes to which Brooks never responded.[4]

The testimony presented by Goldfein contradicted that given by Benowitz who testified that, in July, when the late shoes arrived in the United States, he contacted all of Brooks' customers, including Chesapeake, and asked if they still wanted the shoes. Benowitz testified that Chesapeake stated that it still wanted the shoes and that, because of that response, Brooks subsequently shipped the shoes to Chesapeake. Benowitz stated that Chesapeake never cancelled that shipment and that August was not too late in the season to sell the shoes because they were basketball sneakers which sold well in the fall.

We find the testimony presented by Benowitz on behalf of Brooks to be the more credible. His testimony was clear and convincing that, because of the lateness of the shoes, he gave all of Brooks customers an opportunity to cancel immediately before the goods were shipped. He was emphatic that Chesapeake did not seek to cancel its order before it shipped. Goldfein's testimo-

ny was less clear as to when he cancelled the order. He admitted that when Benowitz first contacted him about the late shipment (he said it was in May, Benowitz said it was in July) he agreed to accept the late goods. Goldfein testified that he later cancelled the order, but it would appear that this was after the shoes had already arrived.[5] We think that that was too late for two reasons. Firstly, we find that Chesapeake agreed to accept the late shoes and, therefore, that there was a binding agreement to modify the delivery date. Section 2–209 of the Uniform Commercial Code provides that parties to a contract may enter into an agreement to modify that contract without further consideration.[6] We therefore conclude that the credible evidence supports a finding that Brooks and Chesapeake entered into an agreement that the shoes would be delivered in August.

Secondly, Goldfein admitted that the shoes were as ordered (other than being late).[7] Consequently, we conclude that Chesapeake has failed to establish that it had a right to reject the shoes or to return them.[8] In particular, § 2–607 provides in relevant part:

(1) The buyer must pay at the contract rate for any goods accepted.

(2) *Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it* unless the acceptance was on the reasonable assumption that the non-conformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this Article for non-conformity.

. . . .

---

4. *See* Exhibit D–4.

5. *See* N.T. at 41. Another discrepancy in Goldfein's testimony on this issue involved the "charge back" which Chesapeake allegedly sent to Brooks for these late shoes. *See* Exh. D–4. Goldfein testified that Chesapeake always sent the original of a "charge back" to the manufacturer but the "charge back" in question which Chesapeake produced from its

files for the trial was an original. This raises a question as to whether that "charge back" was ever sent to Brooks.

6. Pa.Stat.Ann. tit. 12A, § 2–209 (Purdon).

7. *See* N.T. at 41–43.

8. *See, e.g.*, Pa.Stat.Ann. tit. 12A, §§ 2–301, 2–503, 2–504, 2–607, 2–703, 2–709 (Purdon).

(4) The burden is on the buyer to establish any breach with respect to the goods accepted.[9]

Therefore, we conclude that Chesapeake had no right to reject the shoes after they were delivered and that Brooks is, thus, entitled to payment for those goods without the allowance of any credit to Chesapeake.

## II. CREDIT FOR POSTERS AND CATALOGUES.

In its answer and counterclaim, Chesapeake also asserted that it was entitled to a credit of $5400.57 for certain defective shoes and for advertising posters and catalogues. Brooks admitted that Chesapeake was entitled to a credit of $2,839.31 for defective shoes which were returned and improperly credited.[10]

However, Brooks asserted that Chesapeake was not entitled to a credit for the remaining $2,561.26 because that represents the amount due by Chesapeake for posters and catalogues which were delivered and later returned to Brooks by Chesapeake. Brooks claims that those goods are not defective, that Brooks never authorized their return, and that Chesapeake purchased those goods and had no right to return them. Although Chesapeake offered evidence that it sent a "charge back" to Brooks for the return of the posters and catalogues,[11] Goldfein admitted that Brooks never authorized their return or agreed to give a credit for them.[12] Furthermore, Chesapeake failed to offer any evidence that the posters and catalogues were defective in any way.

As a result of the foregoing, we conclude that Chesapeake is not entitled to a credit for those items. The posters and catalogues were ordered by Chesapeake and

properly delivered by Brooks. This completed Brooks' obligation under its contract and, thus, Chesapeake was required to pay for those items.[13] Chesapeake has offered no facts which would excuse it from paying for those goods and, therefore, we conclude that it is bound to pay for them.[14] As stated in comment 3 to § 2–602 of the U.C.C.:

> If the seller has made a tender which in all respects conforms to the contract, the buyer has a positive duty to accept and his failure to do so constitutes a "wrongful rejection" which gives the seller immediate remedies for breach.[15]

Therefore, we will not allow the credit of $2,561.26 which Chesapeake asserts it is due for the return of the posters and catalogues.

## III. CREDIT FOR ORDERS OF SHOES WHICH WERE MISSING SIZES.

In August, 1981, Chesapeake received two shipments of shoes from Brooks that were short certain sizes, that is, they did not include a full range of sizes. As a result, Chesapeake asserted that its customers would not accept any of the shoes. Brooks, after being contacted about the missing sizes, promised to cure the defect. However, shortly thereafter, Brooks filed its petition for reorganization and ceased manufacturing shoes. Consequently, Brooks never shipped the missing sizes to Chesapeake.

Because of these facts, Chesapeake asserts that the orders are not saleable by it and that it is, thus, entitled to a credit of $17,348.76 which represents the difference between the contract price and the market value of the shoes without the missing sizes. Brooks asserts, instead, that the missing

9. *Id.* at § 2–607 (emphasis added).

10. *See* Plaintiff's Memorandum ¶ 1 (filed April 8, 1982).

11. *See* Exhibit D–7.

12. N.T. at 70–71.

13. Section 2–301 of the U.C.C. provides, in general, that:

§ 2–301. General Obligations of Parties

The obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract. Pa.Stat.Ann. tit. 12A, § 2–301 (Purdon).

14. *See* § 2–607 cited in the text at note 9, *supra.*

15. Pa.Stat.Ann. tit. 12A, § 2–602, Comment 3 (Purdon).

sizes were either the smallest or the largest sizes and that without those sizes the shipment was still saleable. Brooks also contends that it would have shipped the missing sizes but was unable to do so when it filed its petition and ceased manufacturing.

We conclude that Chesapeake is entitled to the credit it seeks for the orders of shoes it received with missing sizes. Section 2–608 of the U.C.C. provides that once goods are delivered and accepted by the buyer, the buyer may nevertheless revoke his acceptance if certain conditions are met:

§ 2–608. Revocation of Acceptance in Whole or in Part

(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

(b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involves as if he had rejected them.[16]

Section 2–105(6) defines a commercial unit as:

(6) "Commercial unit" means such a unit of goods as by commercial usage is a single whole for purposes of sale and division of which materially impairs its character or value on the market or in use. A commercial unit may be a single article (as a machine) or a set of articles (as a suite of furniture or an assortment of sizes) or a quantity (as a bale, gross, or carload) or any other unit treated in use or in the relevant market as a single whole.[17]

The testimony presented by Chesapeake, and uncontradicted by Brooks, was that a commercial unit was an order of a style of shoes which contained all of the sizes. Furthermore, we conclude that the orders which were sent to Chesapeake which did not contain all of the sizes were non-conforming units whose non-conformity substantially impaired their value to Chesapeake because it was unable to sell those units to its customers except at drastically reduced prices. In addition, the parties agreed that Chesapeake only accepted the shoes with the assurance of Brooks that the missing shoes would be shipped immediately. Consequently, we conclude that Chesapeake had the right to revoke its acceptance of those goods. Finally, we find that Chesapeake did exercise its right of revocation within a reasonable time and did timely notify Brooks of that revocation.[18] As a result, we conclude that Chesapeake is entitled to a credit of $17,348.76 which was the difference between the cost of those goods and the market price at which Chesapeake was able to sell them.[19]

16. *Id.* at § 2–608.

17. *Id.* at § 2–105(6).

18. *See* Exhibit D–5.

19. Section 2–714 of the U.C.C. provides, in relevant part:

§ 2–714. Buyer's Damages for Breach in Regard to Accepted Goods

(1) Where the buyer has accepted goods and given notification (subsection (3) of Section 2–607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

Pa.Stat.Ann. tit. 12A, § 2–714 (Purdon). No question was raised by Brooks that Chesapeake's sale of these goods was not commercially reasonable and we conclude that the measure of damages sought by Chesapeake herein is certainly reasonable given the circumstances.

## IV. CREDIT FOR DAMAGES CAUSED BY THE SALE OF BROOKS' INVENTORY TO A THIRD PARTY.

██ Following the filing of Brooks' petition for reorganization, the inventory of Brooks was sold (along with certain other assets) to Wolverine World Wide ("W.W. W.") at a price of $7.00 per pair of first quality shoes. W.W.W. is a distributor of shoes as is Chesapeake. The agreement of sale between Brooks and W.W.W. was announced in *Footwear News*, a shoe industry trade paper.[20] Chesapeake asserts that, as a result of this announcement, it was unable to sell its shoes to retailers at its normal price ($12 to $14 per pair). As a result of using its best efforts, Chesapeake asserts that it suffered a loss of $32,680.90 [21] because of the "dumping" of shoes by Brooks at prices below Chesapeake's cost.

We conclude that Chesapeake has no contractual, legal or other basis for its claim. Section 467 of the Restatement of Contracts provides that "facts existing when a bargain is made or occurring thereafter making performance of a promise more difficult or expensive than the parties anticipate, do not ... discharge a duty that has arisen." In *Hancock Paper Co. v. Champion International Corp.*,[22] the United States District Court for the Eastern District of Pennsylvania held that a drop in market prices, even if caused by the actions of one of the parties to a prior sale, did not excuse the performance by the other party to that sale. The court held that such a drop in prices was not a "supervening impossibility" which would excuse performance but was only an "unanticipated difficulty." [23]

Comment 4 to § 2–615 of the U.C.C. states further:

4. Increased cost alone does not excuse performance unless the rise in cost is due to some unforeseen contingency which alters the essential nature of the performance. Neither is a rise or a collapse in the market in itself a justification, *for that is exactly the type of business risk which business contracts made at fixed prices are intended to cover.* [24]

Consequently, we conclude that the drop in market prices, even if caused by Brooks, does not excuse any performance due by Chesapeake under its agreement of sale with Brooks. Therefore, we hold that Chesapeake is liable for the full contract price of the shoes in question and is not entitled to the claimed credit of $32,680.90.

## V. CREDIT FOR SHOES RETURNED TO CHESAPEAKE BY THE RETAILER.

In November, 1981, a major retail customer of Chesapeake returned $13,874.10 worth of shoes. Chesapeake claims that the retailer refused to continue to sell the shoes because of a high percentage of returns by purchasers who complained of defects.[25] Goldfein testified that he spoke to a salesman for Brooks who told him to send a charge back to Brooks for those shoes.[26]

---

20. *See* Exhibit D–12.

21. *See* Exhibits D–13, D–14 and D–15. Chesapeake asserts that the cost of the shoes in question was approximately $82,000.00 while it was only able to sell them for approximately $50,000.00 because of the sale by Brooks to W.W.W.

22. 424 F.Supp. 285 (E.D.Pa.1976), *aff'd,* 565 F.2d 151 (3rd Cir. 1977). In *Hancock*, the defendant had sold paper to the plaintiff and later sold a different quality paper to a third party. The plaintiff asserted that it began encountering marketing problems because of the extra paper on the market. The District Court held, *inter alia*, that a drop in market prices, even if caused by one of the parties to a prior sale, was not such a commercial impracticability as to excuse the other party from performance under either the *U.C.C.* or the *Restatement.* 424 F.Supp. at 290.

23. 424 F.Supp. at 290.

24. Pa.Stat.Ann. tit. 12A, § 2–615, U.C.C. Comment 4 (Purdon) (Emphasis added).

25. *See* Exhibit D–10.

26. *See* N.T. at 45–47. *But see* N.T. at 84–85, where Brooks presented testimony that there were no salesmen working for it in November, 1981, so that no one could have told Goldfein at that time that he could return the shoes.

Goldfein stated that he sent a charge back but never received a response to it.[27]

Brooks contends that, while it has always followed a policy of allowing its distributors to return any defective shoes, it does not allow the return of whole units of shoes which contain non-defective as well as defective shoes. In addition, Brooks offered evidence that only 10–20% of the style of shoe in question had been found to be defective.

■ We conclude that the reasoning which we applied to the orders containing missing sizes is likewise applicable here. Section 2–608 of the U.C.C. permits a buyer to revoke his acceptance of goods whose non-conformity substantially impairs the value of the goods if he accepted those goods on the assumption that the non-conformity would be cured and it was not.[28] In the instant case, Chesapeake accepted the shoes from Brooks on the assumption that any defects would be cured (i.e., that any defective shoes could be returned). Those defects have not been cured. Furthermore, we find that Chesapeake did notify Brooks of its revocation of acceptance of those goods within a reasonable time after it discovered the defects.[29]

■ However, we do not think that Chesapeake's request for $13,874.10 is a reasonable measure of damages for the non-conformity of that unit of shoes.[30] The $13,874.10 represents the total cost of that entire unit. The only testimony on the issue of what part of the unit was defective was the evidence offered by Brooks that only 10–20% was defective. Since no evidence was offered as to how much of an effect that 20% would have on the market value of the unit of shoes, we conclude that a reasonable measure of damages would be 20% of the cost of the unit as a whole. We will,

therefore, allow Chesapeake a credit of 20% of the $13,874.10 or $2,774.82.

## VI. CREDIT FOR ESTIMATED FUTURE DAMAGES FOR DEFECTIVE SHOES.

■ Chesapeake also sought various credits for shoes which were defective and for future damages which it asserts it will incur over the next two years because of the defective shoes. Brooks agreed that Chesapeake is entitled to credits of $7,410.60[31] and $9,158.13[32] because they represent credits for shoes which were actually found to be defective. But, Brooks objects to Chesapeake's claim of $75,000.00 for future damages as being too speculative.

We agree. Chesapeake based the $75,-000.00 figure on its assertion that it was receiving returns from its customers at a rate of $3,000.00 per month and expected to continue to receive returns at that rate over the next two years. However, no evidence was offered to support Chesapeake's assertion that returns will continue to come in at the rate of $3,000.00 per month or that that rate would continue for the next two years. Furthermore, Chesapeake failed to offer any evidence of the number of shoes that are still on the market or of what percentage are likely to be defective.

Brooks, on the other hand, offered credible evidence that the defective shoes were only 10–20% of the total number of shoes sent. Out of a total order of $109,511.06, 20% would amount to $21,902.21. Since we have already given Chesapeake credits for over $39,000.00, which is over 20% of the total due, we conclude that there is insufficient evidence to allow Chesapeake any further credit for future damages.

27. *See* Exhibit D–9.

28. Pa.Stat.Ann. tit. 12A, § 2–608(1)(a) (Purdon). *See* text accompanying note 16, *supra*.

29. *Id.* at § 2–608(2).

30. Pa.Stat.Ann. tit. 12A, § 2–714 (Purdon). See note 19, *supra*.

31. *See* Exhibit D–3. *See also,* Plaintiff's Memorandum at p. 2, numbered ¶ 2 (filed April 8, 1982).

32. *See* Exhibit D–11. *See also,* Plaintiff's Memorandum at p. 6, numbered ¶ 7 (filed April 8, 1982).

**612**

## VII. CONCLUSION

■ From all of the above, we conclude that Chesapeake is entitled to credits of $2,839.31 (for defective shoes),[33] $17,348.76 (for missing sizes),[34] $2,774.82 (for defective shoes),[35] $7,410.60 (for defective shoes),[36] and $9,158.13 (for defective shoes),[37] or a total of $39,531.62. Consequently, we find that Brooks is entitled to a judgment for goods sold and delivered in the amount of $109,511.06 less $39,531.62 or a balance of $69,979.44.

---

**33.** *See* note 10 and accompanying text *supra.*

**34.** *See* note 19 and accompanying text *supra.*

**35.** *See* note 30 and accompanying text *supra.*

**36.** *See* note 31 and accompanying text *supra.*

**37.** *See* note 32 and accompanying text *supra.*