13-3992-cv(L)

# In the
# United States Court of Appeals
## For the Second Circuit

_____

August Term, 2014
Nos. 13-3992-cv; 13-3875-cv; 13-4178-cv; 13-4196-cv

IN RE: TRIBUNE COMPANY FRAUDULENT CONVEYANCE LITIGATION

NOTE HOLDERS, Deutsche Bank Trust Company Americas, Law Debenture
Trust Company of New York, Wilmington Trust Company, INDIVIDUAL
RETIREES, William A. Niese, on behalf of a putative class of Tribune Company
retirees,
Plaintiffs-Appellants-Cross-Appellees,

MARK S. KIRSCHNER, as Litigation Trustee for the Tribune Litigation Trust,
Plaintiff,

TENDERING PHONES HOLDERS, Citadel Equity Fund Ltd., Camden Asset
Management LLP and certain of their affiliates,
Plaintiffs-Intervenors,

v.

LARGE PRIVATE BENEFICIAL OWNERS, FINANCIAL INSTITUTION
HOLDERS, FINANCIAL INSTITUTION CONDUITS, Merrill Lynch, Pierce,
Fenner & Smith, Inc., on behalf of a putative class of former Tribune Company
shareholders, PENSION FUNDS, including public, private, and Taft Hartley
Funds, INDIVIDUAL BENEFICIAL OWNERS, Mario J. Gabelli, on behalf of a
putative class of former Tribune Company shareholders, MUTUAL FUNDS, AT-

1

LARGE, ESTATE OF KAREN BABCOCK, PHILLIP S. BABCOCK, DOUGLAS BABCOCK, DEFENDANTS LISTED ON EXHIBIT B,
Defendants-Appellees-Cross-Appellants,

CURRENT AND FORMER DIRECTORS AND OFFICERS, Betsy D. Holden, Christopher Reyes, Dudley S. Taft, Enrique Hernandez, Jr., Miles D. White, Robert S. Morrison, William A. Osborn, Harry Amsden, Stephen D. Carver, Dennis J. FitzSimons, Robert Gremillion, Donald C. Grenesko, David Dean Hiller, Timothy J. Landon, Thomas D. Leach, Luis E. Le, Mark Hianik, Irving Quimby, Crane Kenney, Chandler Bigelow, Daniel Kazan, Timothy Knight, Thomas Finke, SAM ZELL AND AFFILIATED ENTITIES, EGI-TRB, LLC, Equity Group Investments, LLC, Sam Investment Trust, Samuel Zell, Tower CH, LLC, Tower DC, LLC, Tower DL, LLC, Tower EH, LLC, Tower Gr, LARGE SHAREHOLDERS, Chandler Trusts and their representatives, FINANCIAL ADVISORS, Valuation Research Corporation, Duff & Phelps, LLC, Morgan Stanley & Co. Inc. and Morgan Stanley Capital Services, Inc., GreatBanc Trust Company, Citigroup Global Markets, Inc., CA PUBLIC EMPLOYEE RETIREMENT SYSTEM, CALPERS, UNIVERSITY OF CA REGENTS, T. ROWE PRICE ASSOCIATES, INC., MORGAN KEEGAN & COMPANY, INC., NTCA, DIOCESE OF TRENTON-PENSION FUND, FIRST ENERGY SERVICE COMPANY, MARYLAND STATE RETIREMENT AND PENSION SYSTEM, T BANK LCV QP, T BANK-LCV-PT, JAPAN POST INSURANCE, CO., LTD., SERVANTS OF RELIEF FOR INCURABLE CANCER (AKA DOMINICAN SISTERS OF HAWTHORNE), NEW LIFE INTERNATIONAL, NEW LIFE INTERNATIONAL TRUST, SALVATION ARMY, SOUTHERN TERRITORIAL HEADQUARTERS, CITY OF PHILADELPHIA EMPLOYEES, OHIO CARPENTERS' MIDCAP (AKA OHIO CARPENTERS' PENSION FUND), TILDEN H. EDWARDS, JR., MALLOY AND EVANS, INC., BEDFORD OAK PARTNERS, LP, DUFF AND PHELPS LLC, DURHAM J. MONSMA, CERTAIN TAG-ALONG DEFENDANTS, MICHAEL S. MEADOWS, WIRTZ CORPORATION,
Defendants.

_____

2

Appeal from the United States District Court
for the Southern District of New York
No. 1:11-md-02296

_____

ARGUED: NOVEMBER 5, 2014
DECIDED: MARCH 29, 2016
AMENDED: DECEMBER 19, 2019

_____

Before: WINTER, DRONEY, Circuit <u>Judges</u>, and HELLERSTEIN, <u>District Judge</u>.[*]

_____

Appeal from a dismissal by the United States District Court for the Southern District of New York (Richard J. Sullivan, <u>Judge</u>), of state law, constructive fraudulent conveyance claims brought by creditors' representatives against the Chapter 11 debtor's former shareholders, who were cashed out in an LBO. The district court held that plaintiffs lacked statutory standing under the Bankruptcy Code. We hold that appellants have statutory standing but affirm on the ground that appellants' claims are preempted by Section 546(e) of that Code.

_____

ROY T. ENGLERT, JR. (Lawrence S. Robbins, Ariel N. Lavinbuk, Daniel N. Lerman, Shai D. Bronshtein, Robbins, Russell, Englert, Orseck, Untereiner &

_____

[*] Judge Alvin K. Hellerstein, of the Southern District of New York, sitting by designation.

Sauber LLP, Washington, DC, Pratik A. Shah, James E. Tysse, Z.W. Julius Chen, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, David M. Zensky, Mitchell Hurley, Deborah J. Newman, Akin Gump Strauss Hauer & Feld LLP, New York, NY, Robert J. Lack & Hal Neier, Friedman Kaplan Seiler & Adelman LLP, New York, NY, Daniel M. Scott & Kevin M. Magnuson, Kelley, Wolter & Scott, P.A., Minneapolis, MN, David S. Rosner & Sheron Korpus, Kasowitz Benson Torres & Friedman LLP, New York, NY, Joseph Aronauer, Aronauer Re & Yudell, LLP, New York, NY, on the brief), Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, Washington, DC, for Plaintiffs-Appellants-Cross-Appellees Note Holders.

Jay Teitelbaum, Teitelbaum & Baskin LLP, White Plains, NY, for Plaintiffs-Appellants-Cross-Appellees Individual Retirees.

Joel A. Feuer & Oscar Garza, Gibson, Dunn & Crutcher LLP, Los Angeles, CA, David C. Bohan & John P. Sieger, Katten Muchin Rosenman LLP, Chicago, IL, for Defendants-Appellees-Cross-Appellants Large Private Beneficial Owners.

PHILIP D. ANKER (Alan E. Schoenfeld, Adriel I. Cepeda Derieux, Pablo G. Kapusta, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Sabin Willett & Michael C. D'Agnostino, Bingham

4

McCutchen LLP, Boston, MA, Joel W. Millar, Washington, DC, <u>on the brief</u>), Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY**, <u>for</u> <u>Defendants-Appellees-Cross-Appellants</u> <u>Financial Institution Holders</u>.**

Elliot Moskowitz, Davis Polk & Wardwell LLP, New York, NY, Daniel L. Cantor, O'Melveny & Myers LLP, New York, NY, Gregg M. Mashberg & Stephen L. Ratner, Proskauer Rose LLP, New York, NY, for Defendants-Appellees-Cross-Appellants Financial Institution Conduits.

DOUGLAS HALLWARD-DRIEMEIER, Ropes & Gray LLP, Washington, DC, D. Ross Martin, Ropes & Gray LLP, New York, NY, Matthew L. Fornshell, Ice Miller LLP, Columbus, OH, <u>for</u> <u>Defendants-Appellees-Cross-Appellants</u> <u>Pension Funds</u>.

Andrew J. Entwistle, Entwistle & Cappucci, LLP, New York, NY, David N. Dunn, Potter Stewart, Jr. Law Offices, Brattleboro, VT, Mark A. Neubauer, Steptoe & Johnson LLP, Los Angeles, CA, for Defendants-Appellees-Cross-Appellants Individual Beneficial Owners.

Michael S. Doluisio & Alexander Bilus, Dechert LLP, Philadelphia, PA, Steven R. Schoenfeld, Robinson & Cole LLP, New

5

York, NY, for Defendants-Appellees-Cross-Appellants Mutual Funds.

Alan J. Stone & Andrew M. LeBlanc, Milbank, Tweed, Hadley & McCloy LLP, New York, NY, for Defendant-Appellee-Cross-Appellant At-Large.

Gary Stein, David K. Momborquette, William H. Gussman, Jr., Schulte Roth & Zabel LLP, New York, NY, for Defendants-Appellees-Cross-Appellants Defendants Listed on  Exhibit B.

Kevin Carroll, Securities Industry and Financial Markets Association, Washington, DC, Holly K. Kulka, NYSE Euronext, New York, NY, Marshall H. Fishman, Timothy P. Harkness, David Y. Livshiz, Freshfields Bruckhaus Deringer US LLP, New York, NY, for Amici Curiae Securities Industry and Financial Markets Association, International Swaps and Derivatives Association, Inc., and the NYSE Euronext.

Michael A. Conley, John W. Avery, Tracey A. Hardin, Benjamin M. Vetter, Securities and Exchange Commission, Washington, DC, for Amicus Curiae Securities and Exchange Commission.

WINTER and DRONEY, Circuit Judges:

Representatives of certain unsecured creditors of the Chapter 11 debtor

Tribune Company appeal from Judge Sullivan's grant of a motion to dismiss

their state law, constructive fraudulent conveyance claims brought against

Tribune's former shareholders.  Appellants seek to recover an amount sufficient

to satisfy Tribune's debts to them by avoiding (recovering) payments by Tribune

to shareholders that purchased all of its stock.  The payments occurred in a

transaction commonly called a leveraged buyout ("LBO"),[1] soon after which

Tribune went into Chapter 11 bankruptcy.  Appellants appeal the district court's

dismissal for lack of statutory standing, and appellees cross-appeal from the

district court's rejection of their argument that appellants' claims are preempted.[2]

We address two issues:  (i) whether appellants are barred by the

Bankruptcy Code's automatic stay provision from bringing state law,

constructive fraudulent conveyance claims while avoidance proceedings against

---

[1] In a typical LBO, a target company is acquired with a significant portion of the purchase price being paid through a loan secured by the target company's assets.

[2] Because the issue has no effect on our disposition of this matter, we do not pause to consider whether a cross-appeal was necessary for appellees to raise the preemption issues in this court, but, for convenience purposes, we sometimes refer to those issues by the term cross-appeal.

the same transfers brought by a party exercising the powers of a bankruptcy trustee on an intentional fraud theory are ongoing; and (ii) if not, whether the creditors' state law, constructive fraudulent conveyance claims are preempted by Bankruptcy Code Section 546(e).

On issue (i), we hold that appellants are not barred by the Code's automatic stay because they have been freed from its restrictions by orders of the bankruptcy court and by the debtors' confirmed reorganization plan. On issue (ii), the subject of appellees' cross-appeal, we hold that appellants' claims are preempted by Section 546(e). That Section shields certain transactions from a bankruptcy trustee's avoidance powers, including, inter alia, transfers by or to a financial institution in connection with a securities contract, except through an intentional fraudulent conveyance claim.[3]

We therefore affirm.

---

[3] As discussed infra, after we previously issued an opinion in this appeal, In re Tribune Co. Fraudulent Conveyance Litig. ("Tribune I"), 818 F.3d 98 (2d Cir. 2016), the Supreme Court clarified the test for determining whether a transaction falls within Section 546(e), see Merit Mgmt. Grp., LP v. FTI Consulting, Inc., 138 S. Ct. 883 (2018), causing us to recall the mandate and issue this amended opinion.

BACKGROUND

a) The LBO

Tribune Media Company (formerly known as "Tribune Company") is a multimedia corporation that, in 2007, faced deteriorating financial prospects. Appellee Samuel Zell, a billionaire investor, proposed to acquire Tribune through an LBO. In consummating the LBO, Tribune borrowed over $11 billion secured by its assets. The $11 billion plus, combined with Zell's $315 million equity contribution, was used to refinance some of Tribune's pre-existing bank debt and to cash out Tribune's shareholders for over $8 billion at a premium price –- above its trading range –- per share.

It is undisputed that Tribune transferred the over $8 billion to a "securities clearing agency" or other "financial institution," as those terms are used in Section 546(e), acting as intermediaries in the LBO transaction.[4] Those intermediaries in turn paid the funds to the shareholders in exchange for their shares that were then returned to Tribune. Appellants seek to satisfy Tribune's

_____

[4] Appellees contend that, with respect to the LBO transaction, Tribune also qualified as a "financial institution," but appellants disagree. We describe the facts relevant to that dispute infra.

9

debts to them by avoiding Tribune's payments to the shareholders. Appellants do not seek money from the intermediaries. See Note 15, infra.

b) Bankruptcy Proceedings

On December 8, 2008, with debt and contingent liabilities exceeding its assets by more than $3 billion, Tribune and nearly all of its subsidiaries filed for bankruptcy under Chapter 11 in the District of Delaware. A trustee was not appointed, and Tribune and its affiliates continued to operate the businesses as debtors in possession. See 11 U.S.C. § 1107(a) ("Subject to any limitations on a trustee . . . a debtor in possession shall have all the rights . . . , and powers, and shall perform all the functions and duties . . . of a trustee . . . ."). In discussing the powers of a bankruptcy trustee that can be exercised by a trustee or parties designated by a bankruptcy court, we shall refer to the trustee or such parties as the "trustee et al."

The bankruptcy court appointed an Official Committee of Unsecured Creditors (the "Committee") to represent the interests of unsecured creditors. In November 2010, alleging that the LBO-related payments constituted intentional fraudulent conveyances, the Committee commenced an action under Code Section 548(a)(1)(A) against the cashed out Tribune shareholders, various

10

officers, directors, financial advisors, Zell, and others alleged to have benefitted from the LBO. An intentional fraudulent conveyance is defined as one in which there was "actual intent to hinder, delay, or defraud" a creditor. 11 U.S.C. § 548(a)(1)(A).

In June 2011, two subsets of unsecured creditors filed state law, constructive fraudulent conveyance claims in various federal and state courts. The plaintiffs, the appellants before us, were: (i) the Retiree Appellants, former Tribune employees who hold claims for unpaid retirement benefits and (ii) the Noteholder Appellants, the successor indenture trustees for Tribune's pre-LBO senior notes and subordinated debentures. A constructive fraudulent conveyance is, generally speaking, a transfer for less than reasonably equivalent value made when the debtor was insolvent or was rendered so by the transfer. See Picard v. Fairfield Greenwich Ltd., 762 F.3d 199, 208-09 (2d Cir. 2014).

Before bringing these actions, appellants moved the bankruptcy court for an order stating that: (i) after the expiration of the two-year statute of limitations period during which the Committee was authorized to bring avoidance actions under 11 U.S.C. § 546(a), eligible creditors had regained the right to prosecute their creditor state law claims; and (ii) the automatic stay imposed by Code

11

Section 362(a) was lifted solely to permit the immediate filing of their complaint. In support of that motion, the Committee argued that, under Section 546(a), the "state law constructive fraudulent conveyance transfer claims ha[d] reverted to individual creditors" and that the "creditors should consider taking appropriate actions to preserve those claims." Statement of the Official Committee of Unsecured Creditors in Supp. of Mot. at 3, In re Tribune Co., No 08-13141 (KJC) (Bankr. D. Del. Mar. 17, 2011).

In April 2011, the bankruptcy court lifted the Code's automatic stay with regard to appellants' actions. The court reasoned that because the Committee had elected not to bring the constructive fraudulent conveyance actions within the two-year limitations period following the bankruptcy petition imposed by Section 544, fully discussed infra, the unsecured creditors "regained the right, if any, to prosecute [such claims]." J. App'x at 373. Therefore, the court lifted the Section 362(a) automatic stay "to permit the filing of any complaint by or on behalf of creditors on account of such Creditor [state law fraudulent conveyance] Claims." Id. The court clarified, however, that it was not resolving the issues of whether the individual creditors had statutory standing to bring such claims or whether such claims were preempted by Section 546(e).

On March 15, 2012, the bankruptcy court set an expiration date of June 1, 2012 for the remaining limited stay on the state law, fraudulent conveyance claims. In July 2012, the bankruptcy court ordered confirmation of the proposed Tribune reorganization plan. The plan terminated the Committee and transferred responsibility for prosecuting the intentional fraudulent conveyance action to an entity called the Litigation Trust. The confirmed plan also provided that the Retiree and Noteholder Appellants could pursue "any and all LBO-Related Causes of Action arising under state fraudulent conveyance law," except for the federal intentional fraudulent conveyance and other LBO-related claims pursued by the Litigation Trust. J. App'x at 643. Under the plan, the Retiree and Noteholder Appellants recovered approximately 33 cents on each dollar of debt. The plan was scheduled to take effect on December 31, 2012, the date on which Tribune emerged from bankruptcy.

c) District Court Proceedings

Appellants' various state law, fraudulent conveyance complaints alleged that the LBO payments, made through financial intermediaries as noted above, were for more than the reasonable value of the shares and made when Tribune was in distressed financial condition. Therefore, the complaints concluded, the

payments were avoidable by creditors under the laws of various states. These actions were later consolidated with the Litigation Trust's ongoing federal intentional fraud claims in a multi-district litigation proceeding that was transferred to the Southern District of New York. In re: Tribune Co. Fraudulent Conveyance Litig., 831 F. Supp. 2d 1371 (J.P.M.L. 2011).

After consolidation, the Tribune shareholders moved to dismiss appellants' claims. The district court granted the motion on the ground that the Bankruptcy Code's automatic stay provision deprived appellants of statutory standing to pursue their claims so long as the Litigation Trustee was pursuing the avoidance of the same transfers, albeit under a different legal theory. In re Tribune Co. Fraudulent Conveyance Litig., 499 B.R. 310, 325 (S.D.N.Y. 2013). The court held that the bankruptcy court had only "conditionally lifted the stay." Id. at 314.

The district court rejected appellees' preemption argument based on Section 546(e). That Section bars a trustee et al. from exercising its avoidance powers under Section 544 to avoid certain transactions including, inter alia, transfers "by or to . . . a financial institution . . . in connection with a securities contract," except through an intentional fraudulent conveyance claim. 11 U.S.C. § 546(e). The district court held that Section 546(e) did not bar appellants' actions

14

because: (i) Section 546(e)'s prohibition on avoiding the designated transfers applied only to a bankruptcy trustee et al., id. at 315-16; and (ii) Congress had declined to extend Section 546(e) to state law, fraudulent conveyance claims brought by creditors, id. at 318.

d) Appellate Proceedings

Appellants appealed the dismissal for lack of statutory standing, and appellees cross-appealed the rejection of their argument that appellants' claims are preempted. In a prior opinion, In re Tribune Co. Fraudulent Conveyance Litig. ("Tribune I"), 818 F.3d 98 (2d Cir. 2016), we affirmed the dismissal of appellants' claims on the ground that Section 546(e) preempts "fraudulent conveyance actions brought by creditors whose claims are [] subject to Section 546(e)." Id. at 118, 123-24. At the time, it was the law in this Circuit, under In re Quebecor World (USA) Inc. ("Quebecor"), 719 F.3d 94, 100 (2d Cir. 2013), that the payments at issue fell within Section 546(e) because entities covered by Section 546(e) had served as intermediaries. See Tribune I, 818 F.3d at 120 ("Section 546(e)'s language clearly covers payments, such as those at issue here, by commercial firms to financial intermediaries to purchase shares from the firm's shareholders.").

Appellants petitioned for rehearing en banc, which was denied, and we issued the mandate.  Appellants then petitioned for certiorari, presenting the following question, among others:  "Whether the Second Circuit correctly held . . . that a fraudulent transfer is exempt . . . under 11 U.S.C. § 546(e) when a financial institution acts as a mere conduit for fraudulently transferred property."  Petition for a Writ of Certiorari, Deutsche Bank Trust Co. Ams. v. Robert R. McCormick Found., No. 16-317 (U.S. Sept. 9, 2016), 2016 WL 4761722, at *1.

While that petition was pending, the Supreme Court in Merit Mgmt. Grp., LP v. FTI Consulting, Inc., 138 S. Ct. 883 (2018), rejected Quebecor's interpretation of Section 546(e)'s scope, holding that Section 546(e) does "not protect transfers in which financial institutions served as mere conduits."  Merit Mgmt., 138 at 892.  The question presented in Merit Mgmt. was whether, "in the context of a transfer that was executed via one or more transactions," such as a transfer from Party A to Party D that included Parties B and C as intermediaries, the relevant transfer for purposes of Section 546(e) is the overarching transfer from Party A to Party D or "any component part[] of the overarching transfer," such as the transfer from Party B to Party C.  Id. at 888.  The Court concluded, based on the "plain meaning" of Section 546(e), that the relevant transfer is the overarching transfer,

16

and therefore abrogated the relevant portion of Quebecor.  Id. at 888, 897; see also

id. at 892 n.6 (identifying Quebecor as one of the decisions in conflict with its

holding).

Soon thereafter, Justices Kennedy and Thomas issued a statement

suggesting that this Court might wish to recall its mandate or provide other relief

in light of Merit Mgmt.  See Statement of Justice Kennedy and Justice Thomas

Respecting the Petition for Certiorari, Deutsche Bank Trust Co. Ams., No. 16-317

(Apr. 3, 2018), 2018 WL 1600841.  Appellants subsequently filed a motion to recall

the mandate, and we recalled the mandate in anticipation of further panel

review.

We have since agreed on changes to our prior opinion, which are reflected

in this amended opinion.  Upon the filing of this amended opinion, the original

opinion is vacated.  See, e.g., Brown v. City of Oneonta, New York, 221 F.3d 329,

336 (2d Cir. 2000), amending and superseding 195 F.3d 111 (2d Cir. 1999).

## DISCUSSION

We review de novo the district court's grant of appellees' motion to

dismiss.  See Mary Jo C. v. N.Y. State & Local Ret. Sys., 707 F.3d 144, 151 (2d Cir.

2013).  The relevant facts being undisputed for purposes of this proceeding, only issues of law are before us.[5]

a)  Statutory Standing to Bring the Claims

We first address the district court's dismissal of appellants' claims on the ground that they lacked standing to bring them because of Section 362(a)(1).[6]  In re Tribune, 499 B.R. at 325.  When a bankruptcy action is filed, any "action or proceeding against the debtor" is automatically stayed by Section 362(a).  The

---

[5] Appellants argue that one of the issues we address infra -- whether Tribune's payments to shareholders remain subject to Section 546(e) following Merit Mgmt. -- requires resolving two factual disputes "never before tested in this case," thus precluding a determination as a matter of law and necessitating a remand to the district court.  Appellants' Reply in Support of Motion to Recall the Mandate at 9-11.  Neither of the disputes identified by appellants is factual in nature, however.  Appellants first contend that certain documents cited by appellees do not suffice to establish that Computershare Trust Company, N.A. was Tribune's "agent" in connection with the LBO payments.  But that argument does not present a factual dispute about the content or accuracy of those documents; instead, it only challenges the legal significance of the documents, raising a pure question of law.  Second, appellants argue that a contract to redeem shares is not a "securities contract" within the meaning of 11 U.S.C. § 101(22)(A).  But that argument, too, is plainly legal.  Thus, there are no factual disputes precluding our consideration of whether Tribune's payments to shareholders remain subject to Section 546(e) following Merit Mgmt., and a remand is unnecessary.

[6] The term "standing" has been used to describe issues arising in bankruptcy proceedings when individual creditors sue to recover funds from third parties to satisfy amounts owed to them by the debtor, and that action is defended on the ground that the recovery seeks funds that are recoverable under the Code only by a representative of all creditors.  St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688, 696-97 (2d Cir. 1989), disapproved of on other grounds by In re Miller, 197 B.R. 810 (W.D.N.C. 1996).  The use of the term "standing" is based on the suing creditors' need to demonstrate an injury other than one redressable under the Code only by the trustee et al.  Id. at 704.

18

purpose of the stay is "to protect creditors as well as the debtor," <u>Ostano Commerzanstalt v. Telewide Sys., Inc.</u>, 790 F.2d 206, 207 (2d Cir. 1986) (per curiam), by avoiding wasteful, duplicative, individual actions by creditors seeking individual recoveries from the debtor's estate, and by ensuring an equitable distribution of the debtor's estate. See In re McMullen, 386 F.3d 320, 324 (1st Cir. 2004) (noting that Section 362(a)(1), among other things, "safeguard[s] the debtor estate from piecemeal dissipation . . . ensur[ing] that the assets remain within the exclusive jurisdiction of the bankruptcy court pending their orderly and equitable distribution among the creditors"). Although fraudulent conveyance actions are against third parties rather than a debtor, there is caselaw, discussed infra, stating that the automatic stay applies to such actions.[7] See In re Colonial Realty Co., 980 F.2d 125, 131 (2d Cir. 1992).

The district court ruled that Section 362's automatic stay provision deprived appellants of statutory standing to bring their claims because the Litigation Trustee was still pursuing an intentional fraudulent conveyance action challenging the same transfers under Section 548(a)(1)(A). In re Tribune, 499 B.R.

---

[7] The implications of applying the automatic stay to fraudulent conveyance actions are discussed <u>infra</u>.

19

at 322-23.  We disagree.  The Bankruptcy Code empowers a bankruptcy court to release parties from the automatic stay "for cause" shown.  In re Bogdanovich, 292 F.3d 104, 110 (2d Cir. 2002) (quoting 11 U.S.C. § 362(d)(1)).  Once a creditor obtains "a grant of relief from the automatic stay" under Section 362(d), it may "press its claims outside of the bankruptcy proceeding."  St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688, 702 (2d Cir. 1989), disapproved of on other grounds by In re Miller, 197 B.R. 810 (W.D.N.C. 1996).

In the present matter, the bankruptcy court granted appellants relief from the automatic stay on three occasions.  On April 25, 2011, the bankruptcy court granted appellants relief "to permit the filing of any complaint by or on behalf of creditors on account of such Creditor [state law fraudulent conveyance] Claims." J. App'x at 373.  A second order, entered on June 28, 2011, clarified that "neither the automatic stay of [Section 362] nor the provisions of the [original lift-stay order]" barred the parties in the state law actions from consolidating and coordinating these actions.  J. App'x at 376.  And the bankruptcy court's third order, entered on March 15, 2012, set an expiration date of June 1, 2012, for the "stay imposed on the state law constructive fraudulent conveyance actions."  J. App'x at 521.  None of the Tribune shareholders filed objections to these orders.

Finally, the reorganization plan, confirmed by the bankruptcy court and in all pertinent respects an order of that court, expressly allowed appellants to pursue "any and all LBO-Related Causes of Action arising under state fraudulent conveyance law." J. App'x at 643. Section 5.8.2 of the plan provided that "nothing in this Plan shall or is intended to impair" the rights of creditors to attempt to pursue disclaimed state law avoidance claims. J. App'x at 695.

Thus, under both the bankruptcy court's orders and the confirmed reorganization plan, if appellants had actionable state law, constructive fraudulent conveyance claims, assertion of those claims was no longer subject to Section 362's automatic stay. See, e.g., In re Heating Oil Partners, LP, 422 F. App'x 15, 18 (2d Cir. 2011) (holding that the automatic stay terminates at discharge); United States v. White, 466 F.3d 1241, 1244 (11th Cir. 2006) (similarly recognizing that the automatic stay terminates when "a discharge is granted").

For the foregoing reasons, we hold that appellants' claims are not barred by Section 362.

b) Section 546(e) and Preemption

We turn now to the issue raised by the cross-appeal: whether appellants' claims are preempted because they conflict with Code Section 546(e).

21

1. The Scope of Section 546(e)

The threshold question in our preemption inquiry is whether, in the aftermath of Merit Mgmt., 138 S. Ct. 883, Tribune's payments to the shareholders remain subject to Section 546(e). As discussed above, it was previously the law in this Circuit that the payments were subject to Section 546(e) because entities covered by Section 546(e) had served as intermediaries. See Tribune I, 818 F.3d at 120; Quebecor, 719 F.3d at 100. Now, however, the parties agree that Merit Mgmt. "forecloses" that basis for finding the payments covered by Section 546(e). Appellees' Opposition to Appellants' Motion to Recall the Mandate at 16; see also Merit Mgmt., 138 S. Ct. at 892 (holding that Section 546(e) does "not protect transfers in which financial institutions served as mere conduits"). Accordingly, we must determine whether there is an alternative basis for finding that the payments are covered. For the reasons that follow, we find that such a basis exists.

(i) Tribune is a Covered Entity

Under Merit Mgmt., the payments at issue can be subject to Section 546(e) only if (1) Tribune, which made the payments, was a covered entity; or (2) the shareholders, who ultimately received the payments, were covered entities. See

22

Merit Mgmt., 138 S. Ct. at 893 ("[T]he relevant transfer for purposes of the §

546(e) safe-harbor inquiry is the overarching transfer[.]").  According to

appellees, that requirement is satisfied because appellants' complaints,

transaction documents that are integral to those complaints, and materials subject

to judicial notice establish that Tribune was a "financial institution" for the

purposes of Section 546(e).[8]  See Appellees' Opposition to Appellants' Motion to

Recall the Mandate at 16-20.  Tribune was a "financial institution," appellees

maintain, because it was a "customer" of Computershare Trust Company, N.A.

("Computershare"), and Computershare was its agent in the LBO transaction.  Id.

at 17-18.  We agree with appellees that Tribune was a "financial institution" and

therefore a covered entity.

Section 546(e) provides in relevant part that "the trustee may not avoid . . .

a transfer made by or to (or for the benefit of) a . . . financial institution, . . . in

connection with a securities contract, as defined in section 741(7)," except

through an intentional fraudulent conveyance claim.  11 U.S.C. § 546(e).  Section

101(22) of the Code defines "financial institution," to include, inter alia, "an entity

---

[8] Appellees also argue that Tribune was a covered entity because it was a "financial participant," and that the shareholders were likewise covered entities.  Having agreed with appellees that Tribune was a "financial institution," we do not reach either of appellees' alternative arguments.

that is a commercial or savings bank, . . . trust company, . . . and, when any such .

. . entity is acting as agent or custodian for a customer (whether or not a

'customer', as defined in section 741) in connection with a securities contract (as

defined in section 741) <u>such customer</u>."[9]  11 U.S.C. § 101(22)(A) (emphasis

added).

Here, Tribune retained Computershare to act as "Depositary" in

connection with the LBO tender offer.  See Tribune Offer to Purchase at 13, 113,

In re Tribune Co., No. 08-13141 (KJC) (Bankr. D. Del. Aug. 20, 2010), ECF Nos.

5437-5, 5437-6. Computershare is a "financial institution" for the purposes of

Section 546(e) because it is a trust company and a bank.  <u>See</u> Office of the

Comptroller of the Currency, Trust Banks Active as of November 30, 2019, at

https://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists

/trust-by-name.pdf; Office of the Comptroller of the Currency, National Banks

Active as of November 30, 2019, at

https://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists

---

[9] As the Court noted in <u>Merit Mgmt.</u>, "[t]he parties [t]here d[id] not contend that either the debtor or petitioner in th[at] case qualified as a 'financial institution' by virtue of its status as a 'customer' under § 101(22)(A).  Petitioner Merit Management Group, LP, discussed th[at] definition only in footnotes and did not argue that it somehow dictate[d] the outcome in th[e] case."  <u>Merit Mgmt.</u>, 138 S. Ct. at 890 n.2.  The Court "therefore d[id] not address what impact, if any, § 101(22)(A) would have in the application of the § 546(e) safe harbor."  <u>Id.</u>

/national-by-name.pdf. Therefore, Tribune was likewise a "financial institution" with respect to the LBO payments if it was Computershare's "customer," and Computershare was acting as its agent. See 11 U.S.C. § 101(22)(A).

In its role as Depositary, Computershare performed multiple services for Tribune. First, Computershare received and held Tribune's deposit of the aggregate purchase price for the shares. See Examiner's Report, Vol. 1, at 206, In re Tribune Co., No. 08-13141 (KJC) (Bankr. D. Del. Aug. 3, 2010), ECF No. 5247. Then, Computershare received tendered shares, retained them on Tribune's behalf, and paid the tendering shareholders. Id.; see also Tribune Offer to Purchase at 81, In re Tribune Co., No. 08-13141 (KJC) (Bankr. D. Del. Aug. 20, 2010), ECF Nos. 5437-5, 5437-6.

Given these facts, we conclude that Tribune was Computershare's "customer" with respect to the LBO payments. Although Section 741 of the Code provides a specialized definition of "customer" for certain purposes, see 11 U.S.C. § 741(2), the relevant section for these purposes, Section 101(22), plainly states that its definition of "customer" is not limited by Section 741's definition, see 11 U.S.C. § 101(22)(A) (defining "financial institution" to include certain entities when such entities are "acting as agent . . . for a customer (whether or not

25

a 'customer,' as defined in section 741)"). Moreover, Section 101(22) does not provide any alternative specialized definition. Thus, we must give the term its "ordinary meaning."[10] Ransom v. FIA Card Servs., N.A., 562 U.S. 61, 69 (2011). We have previously recognized that the "core" ordinary definition of "customer" is "someone who buys goods or services." UBS Fin. Servs., Inc. v. W. Virginia Univ. Hosps., Inc., 660 F.3d 643, 650 (2d Cir. 2011) (citing multiple dictionary definitions). Black's Law Dictionary, which provides more granular definitions, defines "customer" to include "a person . . . for whom a bank has agreed to collect items." Black's Law Dictionary (10th ed. 2014). Regardless of which definition we apply, Tribune would qualify as Computershare's customer.

---

[10] Appellants suggest that we should apply the specialized definition of "customer" given in Section 761(9), see Appellants' Reply in Support of Motion to Recall the Mandate at 10-11, which appears in a subchapter dealing with commodity broker liquidations. See 11 U.S.C. § 761(9). Section 761(9)'s definition, unlike the definition of "customer" from Section 741(2), is not explicitly disclaimed in Section 101(22). Nonetheless, we believe it is clear that the definitions from Section 761(9) and Section 101(22) are not intended to be coextensive. First, there is no indication in Section 101(22)'s text that Section 761(9)'s limited definition of "customer" should apply. Moreover, Section 101(22)'s explicit disclaimer of Section 741(2)'s definition suggests that "customer" should be given a broad meaning, so it would be odd to hold – without any textual indication – that the definition in Section 761(9) circumscribes Section 101(22). In addition, other subsections of Section 101 explicitly incorporate definitions from Section 761, including its definition of "customer" specifically. See, e.g., 11 U.S.C. § 101(6) ("The term 'commodity broker' means futures commission merchant, foreign futures commission merchant, clearing organization, leverage transaction merchant, or commodity options dealer, as defined in section 761 of this title, with respect to which there is a customer, as defined in section 761 of this title."). Thus, if Congress had intended to import Section 761(9)'s definition into Section 101(22), it clearly knew how (yet declined) to do so.

26

Computershare agreed to collect items for Tribune by receiving the tendered shares and retaining them, and Tribune bought Computershare's services by retaining Computershare to act as Depositary.

It is likewise plain that Computershare was Tribune's agent. "[S]tatutes employing common-law terms," such as agent, "are presumed . . . 'to incorporate the established meaning of th[o]se terms,'" absent a contrary indication. U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc., 822 F.3d 650, 657 (2d Cir. 2016) (quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322 (1992)). Here, the parties have not identified any reason why the term "agent," for the purposes of Section 101(22), should be given anything other than its common-law meaning, and we have identified none. Thus, we will apply its common-law meaning.

At common law, "[a]gency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006); see also Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A., 347 F.3d 448, 462 (2d Cir. 2003) ("Establishment of [an agency] relationship requires facts sufficient to show (1) the principal's manifestation of

27

intent to grant authority to the agent, and (2) agreement by the agent. In addition, the principal must maintain control over key aspects of the undertaking.") (internal citations omitted). Generally, "[w]hether an agency relationship exists is a mixed question of law and fact." Commercial Union Ins., 347 F.3d at 462. However, the existence of an agency relationship can be resolved "as a matter of law" if: "(1) the facts are undisputed; or (2) there is but one way for a reasonable jury to interpret them." Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc., 697 F.3d 59, 71 (2d Cir. 2012).

Here, Tribune manifested its intent to grant authority to Computershare by depositing the aggregate purchase price for the shares with Computershare and entrusting Computershare to pay the tendering shareholders. Computershare, in turn, manifested its assent by accepting the funds and effectuating the transaction. Then, as the transaction proceeded, Tribune maintained control over key aspects of the undertaking. See Tribune Offer to Purchase at 81, In re Tribune Co., No. 08-13141 (KJC) (Bankr. D. Del. Aug. 20, 2010), ECF Nos. 5437-5, 5437-6 ("For purposes of the Tender Offer, [Tribune] will be deemed to have accepted payment . . . shares that are properly tendered and not properly withdrawn only when, as and if we give oral or written notice to [Computershare] of our

28

acceptance of the shares for payment pursuant to the Tender Offer . . .”).

Accordingly, the undisputed facts establish that Computershare was Tribune's

agent,[11] and we conclude that Tribune was a "financial institution" with respect

to the LBO payments.

That conclusion does not end our assessment of whether the payments are

subject to Section 546(e), however, because we must also determine whether all

of the payments were made "in connection with a securities contract." See

Appellees' Opposition to Appellants' Motion to Recall the Mandate at 20;

Appellants' Reply in Support of Motion to Recall the Mandate at 10.

> (ii) The Payments were Made in Connection with a
>
> "Securities Contract"

As stated above, Section 546(e) covers transfers "made by or to (or for the

benefit of) a . . . financial institution, . . . in connection with a securities contract,

as defined in section 741(7)[.]"[12]  11 U.S.C. § 546(e).  Appellants do not dispute

---

[11] The decision cited by appellants, Manufacturers Hanover Tr. Co. v. Yanakas, 7 F.3d 310 (2d Cir. 1993), see Appellants' Reply in Support of Motion to Recall the Mandate at 10, is inapposite.  That decision involved the application of the rule that, under normal circumstances, a creditor-debtor relationship does not amount to a fiduciary relationship. Manufacturers Hanover Tr., 7 F.3d at 319.  Tribune and Computershare were not in a creditor-debtor relationship.

[12] Section 546(e) also covers certain "settlement payments," which need not be "in connection with a securities contract," see 11 U.S.C. § 546(e), but appellees' theory is that the

that "approximately half" of the payments were made in connection with a securities contract because they involved the purchase of shares. See Appellants' Reply in Support of Motion to Recall the Mandate at 10 (acknowledging that the term "securities contract," for these purposes, "encompasses contracts 'to purchase shares'") (emphasis removed). However, they contend that the remaining payments were not made in connection with a securities contract because they involved the redemption, rather than the purchase, of shares. See id.

We disagree with appellants. The term "redemption," in the securities context, means "repurchase." See Quebecor, 719 F.3d at 99 ("Generally, 'to redeem is defined as to purchase back; to regain possession by payment of a stipulated price; to repurchase; to regain, as mortgage property, by paying what is due; to receive back by paying the obligation.'") (quoting In re United Educ. Co., 153 F. 169, 171 (2d Cir. 1907)); Merriam-Webster's Collegiate Dictionary 1042 (11th ed. 2003) (defining "redeem" as "to buy back" or "repurchase"). Section 741(7) defines "securities contract" capaciously to include, inter alia, a "contract

_____

payments are covered because they were transfers made in connection with a securities contract. See Appellees' Opposition to Appellants' Motion to Recall the Mandate at 20. Thus, we are not deciding whether the payments at issue qualify as "settlement payments" under Section 546(e).

for the purchase [or] sale . . . of a security, . . . including any repurchase . . . transaction on any such security," 11 U.S.C. § 741(7)(A)(i) (emphasis added), as well as "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph." 11 U.S.C. § 741(7)(A)(vii); see also In re Bernard L. Madoff Inv. Sec. LLC, 773 F.3d 411, 417 (2d Cir. 2014) (observing that Section 741(7)"defines 'securities contract' with extraordinary breadth"). Thus, we have no trouble concluding, based on Section 741(7)'s plain language, that all of the payments at issue, including those connected to the redemption of shares, were "in connection with a securities contract."

(iii) Conclusion

For the foregoing reasons, we agree with appellees that the payments at issue remain subject to Section 546(e) following Merit Mgmt.

2. Conflict-Preemption Law

Under the Supremacy Clause, Article VI, Clause 2 of the Constitution, federal law prevails when it conflicts with state law. Arizona v. United States, 132 S. Ct. 2492, 2500 (2012).

As discussed throughout this opinion, Section 546(e)'s reference to limiting avoidance by a trustee provides appellants with a plain language argument that

only a trustee et al., and not creditors acting on their own behalf, are barred from bringing state law, constructive fraudulent avoidance claims.  However, as discussed infra, we believe that the language of Section 546(e) does not necessarily have the meaning appellants ascribe to it.  Even if that meaning is one of multiple reasonable constructions of the statutory scheme, it would not necessarily preclude preemption because a preemptive effect may be inferred where it is not expressly provided.

Under the implied preemption doctrine,[13] state laws are "pre-empted to the extent of any conflict with a federal statute.  Such a conflict occurs . . . when [] state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  Hillman v. Maretta, 133 S. Ct. 1943, 1949-50 (2013) (citations and internal quotation marks omitted); accord In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., 725 F.3d 65, 97 (2d Cir. 2013) cert. denied sub nom. Exxon Mobil Corp. v. City of New York, 134 S. Ct.

---

[13] We see no need for a full discussion of various modes of analysis used to determine federal preemption, i.e., "express" preemption, Chamber of Commerce v. Whiting, 131 S. Ct. 1968, 1977 (2011), "field" preemption, Arizona v. United States, 132 S. Ct. 2492, 2502 (2012), or even that branch of "implied" preemption that requires a showing of "impossibility" of complying with both state and federal law, id. at 2501.  The only relevant analysis in the present matter is preemption inferred from a conflict between state law and the purposes of federal law, as discussed in the text.

1877 (2014) (courts will find implied preemption when "state law directly conflicts with the structure and purpose of a federal statute") (citation and internal quotation marks omitted).  Appellants argue that a recognized presumption against preemption limits the implied preemption doctrine.  They argue that Section 546(e) preempts creditors' state law, fraudulent conveyance claims only if the claims would do "'major damage' to 'clear and substantial' federal interests."  Resp. & Reply Br. of Pls.-Appellants-Cross-Appellees 45 (quoting Hillman, 133 S. Ct. 1943, 1950 (2013) (citation omitted)).  The presumption against inferring preemption is premised on federalism grounds and, therefore, weighs most heavily where the particular regulatory area is "traditionally the domain of state law."  Hillman, 133 S. Ct. at 1950; see also Madeira v. Affordable Hous. Found., Inc., 469 F.3d 219, 241 (2d Cir. 2006) ("The mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power.").  According to appellants, the presumption against preemption fully applies in the present context because fraudulent conveyance claims are "among 'the oldest [purposes] within the ambit

of the police power.'"  Resp. & Reply Br. of Pls.-Appellants-Cross-Appellees 36 (quoting California v. Zook, 336 U.S. 725, 734 (1949)).

Preemption is always a matter of congressional intent, even where that intent must be inferred.  See Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516 (1992) (congressional intent is the "ultimate touchstone of pre-emption analysis") (quoting Malone v. White Motor Corp., 435 U.S. 497, 504 (1978)) (internal quotation marks omitted); N.Y. SMSA Ltd. P'ship v. Town of Clarkstown, 612 F.3d 97, 104 (2d Cir. 2010) ("The key to the preemption inquiry is the intent of Congress.").  As in the present matter, the presumption against preemption usually goes to the weight to be given to the lack of an express statement overriding state law.

The presumption is strongest when Congress is legislating in an area recognized as traditionally one of state law alone.  See Hillman, 133 S. Ct. at 1950 (stating that because "[t]he regulation of domestic relations is traditionally the domain of state law . . . [t]here is [] a presumption against pre-emption") (internal quotation marks and citation omitted).  However, the present context is not such an area.  To understate the proposition, the regulation of creditors' rights has "a

history of significant federal presence." <u>United States v. Locke</u>, 529 U.S. 89, 90 (2000).

Congress's power to enact bankruptcy laws was made explicit in the Constitution as originally enacted, Art. 1, § 8, cl. 4, and detailed, preemptive federal regulation of creditors' rights has, therefore, existed for over two centuries. Charles Jordan Tabb, <u>The History of the Bankruptcy Laws in the United States</u>, 3 Am. Bankr. Inst. L. Rev. 5, 7 (1995). Once a party enters bankruptcy, the Bankruptcy Code constitutes a wholesale preemption of state laws regarding creditors' rights. <u>See</u> <u>Eastern Equip. and Servs. Corp. v. Factory Point Nat. Bank, Bennington</u>, 236 F.3d 117, 120 (2d Cir. 2001) ("The United States Bankruptcy Code provides a comprehensive federal system of penalties and protections to govern the orderly conduct of debtors' affairs and creditors' rights."); <u>In re Miles</u>, 430 F.3d 1083, 1091 (9th Cir. 2005) ("Congress intended the Bankruptcy Code to create a whole scheme under federal control that would adjust <u>all</u> of the rights and duties of creditors and debtors alike . . . .").

Consider, for example, the present proceeding. While the issue before us is often described as whether Section 546(e) preempts state fraudulent conveyance laws, Resp. & Reply Br. of Pls.-Appellants-Cross-Appellees 33, that is a

mischaracterization. Appellants' state law claims were preempted when the Chapter 11 proceedings commenced and were not dismissed. Appellants' own arguments posit that those claims were, at the very least, stayed by Code Section 362. Whether, as appellants argue, they were restored in full after two years, see 11 U.S.C. § 546(a)(1)(A), or by order of the bankruptcy court, see 11 U.S.C. § 349(b)(3), is hotly disputed. But if they were restored, it was by force of federal law.

Once Tribune entered bankruptcy, the creditors' avoidance claims were vested in the federally appointed trustee et al. 11 U.S.C. § 544(b)(1). A constructive fraudulent conveyance action brought by a trustee et al. under Section 544 is a claim arising under federal law. See In re Intelligent Direct Mktg., 518 B.R. 579, 587 (E.D. Cal. 2014); In re Trinsum Grp., Inc., 460 B.R. 379, 387-88 (S.D.N.Y. 2011); In re Sunbridge Capital, Inc., 454 B.R. 166, 169 n.16 (Bankr. D. Kan. 2011); In re Charys Holding Co., Inc., 443 B.R. 628, 635-36 (Bankr. D. Del. 2010). Although such a claim borrows applicable state law standards regarding avoiding the transfer in question, see Universal Church v. Geltzer, 463 F.3d 218, 222 n.1 (2d Cir. 2006), the claim has its own statute of limitations, 11 U.S.C. § 546(a)(1)(A), measure of damages, see 11 U.S.C. § 550, and standards for

distribution, 11 U.S.C. § 726. A disposition of this federal law claim extinguishes the right of creditors to bring state law, fraudulent conveyance claims. See St. Paul Fire, 884 F.2d at 701 disapproved of on other grounds by In re Miller, 197 B.R. 810 (W.D.N.C. 1996) (noting that "creditors are bound by the outcome of the trustee's action"); see also In re PWS Holding Corp., 303 F.3d 308, 314-15 (3d Cir. 2002) (barring creditor's state law, fraudulent transfer claims after trustee released § 544 claims). And, if creditors are allowed by a bankruptcy court, trustee, or, as appellants argue, by the Bankruptcy Code, to bring state law actions in their own name, that permission is a matter of grace granted under federal authority. The standards for granting that permission, moreover, have everything to do with the Bankruptcy Code's balancing of debtors' and creditors' rights, In re Coltex Loop Cent. Three Partners, L.P., 138 F.3d 39, 44 (2d Cir. 1998), or rights among creditors, United States v. Ron Pair Enters, Inc., 489 U.S. 235, 248 (1989), and nothing to do with the vindication of state police powers.

We also note here, and discuss further infra, that the policies reflected in Section 546(e) relate to securities markets, which are subject to extensive federal regulation. The regulation of these markets has existed and grown for over eighty years and reflects very important federal concerns.

In the present matter, therefore, there is no measurable concern about federal intrusion into traditional state domains. Our bottom line is that the issue before us is one of inferring congressional intent from the Code, without significant countervailing pressures of state law concerns.

3. The Language of Section 546(e)

Section 544(b) empowers a trustee <u>et al.</u> to avoid a "transfer . . . [by] the debtor . . . voidable under applicable law by a[n] [unsecured] creditor." Section 548(a) also provides the trustee <u>et al.</u> with independent federal intentional, 11 U.S.C. § 548(a)(1)(A), and constructive fraudulent conveyance claims, 11 U.S.C. § 548(a)(1)(B).

Section 546(e) provides in pertinent part:

> Notwithstanding sections 544, . . . 548(a)(1)(B) . . . of this title, the trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of) a . . . stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a . . . stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract . . . except under section 548(a)(1)(A). . . .

Id. § 546(e). Section 546(e) thus expressly prohibits trustees et al. from using their Section 544(b) avoidance powers and (generally) Section 548 against the transfers specified in Section 546(e). However, Section 546(e) creates an exception to that

prohibition for claims brought by trustee et al. under Section 548(a)(1)(A) that, as noted, establishes a federal avoidance claim to be brought by a trustee et al. based on an intentional fraud theory. As discussed supra, the Litigation Trust brought a Section 548(a)(1)(A) claim against the same transfers challenged by appellants' actions before us on this appeal, which was still pending when appellants' claims were dismissed.

The language of Section 546(e) covers all transfers by or to covered entities that are "settlement payment[s]" or "in connection with a securities contract." Transfers in which either the transferor or transferee is not a covered entity are clearly included in the language, so long as one of the two is a covered entity. The Section does not distinguish between kinds of transfers, e.g., settlements of ordinary day-to-day trading, LBOs, or mergers in which shareholders of one company are involuntarily cashed out. So long as the transfer sought to be avoided is within the language quoted above, the Section includes avoidance proceedings in which the covered entity would escape a damages judgment. But see In re Lyondell Chem. Co., 503 B.R. 348, 372-73 (Bankr. S.D.N.Y. 2014), as corrected (Jan. 16, 2014) (holding that Section 546(e) does not include "LBO payments to stockholders at the very end of the asset transfer chain, where the

39

stockholders are the ultimate beneficiaries of the constructively fraudulent transfers, and can give the money back to injured creditors with no damage to anyone but themselves").

### 4. Appellants' Legal Theory

Appellants' state law, constructive fraudulent conveyance claims purport to be brought under mainstream bankruptcy procedures directly mandated by the Code. However, an examination of the Code as a whole, in contrast with an isolated focus on the word "trustee" in Section 546(e), reveals that appellants' theory relies upon adhering to statutory language only when opportune and resolving various ambiguities in a way convenient to that theory. Even then, their legal theory results in anomalies and inconsistencies with parts of the Code. The consequence of those ambiguities, anomalies, and conflicts is that a reader of Section 546(e), at the time of enactment, would not have necessarily concluded that the reference only to a trustee et al. meant that creditors may at some point bring state law claims seeking the very relief barred to the trustee et al. by Section 546(e). Its meaning, therefore, is not plain.

(i) Appellants' Theory of Fraudulent Conveyance Avoidance

Proceedings

Appellants' theory goes as follows. When a debtor enters bankruptcy, all "legal or equitable interests of the debtor in property," 11 U.S.C. § 541(a)(1), vest in the debtor's bankruptcy estate. This property includes legal claims that could have been brought by the debtor. See U.S. ex rel. Spicer v. Westbrook, 751 F.3d 354, 361-62 (5th Cir. 2014) ("The phrase 'all legal or equitable interests' includes legal claims–whether based on state or federal law."). Therefore, "the Trustee is conferred with the authority to represent all creditors and the Debtor's estate and with the sole responsibility of bringing actions on behalf of the Debtor's estate to marshal assets for the estate's creditors." In re Stein, 314 B.R. 306, 311 (D.N.J. 2004). However, fraudulent conveyance claims proceed on a theory that an insolvent debtor may not make what are essentially gifts that deprive creditors of assets available to pay debts. See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 322 (1999). Therefore, before a bankruptcy takes place, fraudulent conveyance claims belong to creditors rather than to the debtor. As a consequence, Section 544(b)(1) provides that a bankruptcy trustee may avoid "any transfer of an interest of the debtor . . . that is voidable under

41

applicable law by a creditor holding an unsecured claim." 11 U.S.C. § 544(b)(1).

The responsibility of the trustee et al. is to "step into the shoes of a creditor under state law and avoid any transfers such a creditor could have avoided." Univ. Church v. Geltzer, 463 F.3d 218, 222 n.1 (2d Cir. 2006).

The trustee et al., however, is subject to a statute of limitations that requires such claims to be brought within two years of the commencement of the bankruptcy proceeding. See 11 U.S.C. § 546(a)(1)(A). Appellants infer from this statute of limitations that if the trustee et al. fails to act to enforce such claims during that two-year period, the claims revert to creditors who may then pursue their own state law, fraudulent conveyance actions. Resp. & Reply Br. of Pls.-Appellants-Cross-Appellees 1. This position assumes that, although the power to bring such actions is clearly vested in the trustee et al. when the bankruptcy proceeding begins, if the power is not exercised, it returns in full flower to the creditors after the bankruptcy ends or after two years.

Appellants' theory also is that their fraudulent conveyance claims were only stayed under Section 362(a), rather than extinguished when assumed by the trustee on behalf of the bankrupt estate by the trustee et al. under Section 544, and could be asserted by them as creditors when the Section 362(a) stay was

lifted. Accordingly, appellants argue, when the Committee did not bring constructive fraudulent conveyance actions against the LBO transfers by December 8, 2010, appellants regained the right to bring their own state law actions. See Resp. & Reply Br. of Pls.-Appellants-Cross Appellees 6. Moreover, they correctly note that Section 362's automatic stay was, as discussed supra, lifted. In either case -- automatically after two years or by the bankruptcy court's lifting of the stay -- appellants assert that the right to bring state law actions has reverted to them.

(ii) Ambiguities, Anomalies, and Conflicts

When appellants' arguments and their relation to the Code are viewed, as we must view them, in their entirety, In re Boodrow, 126 F.3d 43, 49 (2d Cir. 1997) ("The Supreme Court has thus explained . . . 'we must not be guided by a single sentence or [part] of a sentence [of the Code], but look to the provisions of the whole law, and to its object and policy.'") (quoting Kelly v. Robinson, 479 U.S. 36, 43 (1986)), they reveal material ambiguities, anomalies, and outright conflicts with the purposes of Code Sections 544, 362, and 548, not to mention the outright conflict with Section 546(e) discussed infra.

A critical step in the logic of appellants' theory finds no support in the language of the Code. In particular, the inference that fraudulent conveyance actions revert to creditors if either the two-year statute of limitations passes without an exercise of the trustees' et al. powers under Section 544 or the Section 362(a) stay is lifted by the bankruptcy court has no basis in the Code's language. To begin, the language of the automatic stay provision applies only to actions against "the debtor." 11 U.S.C. § 362. To be sure, there are cases barring fraudulent conveyance actions brought by creditors before the passing of the limitations period or lifting of the stay. See, e.g., In re Crysen/Montenay Energy Co., 902 F.2d 1098, 1101 (2d Cir. 1990). The rationales of these cases vary. Some rely on Section 362(a) on the theory that the fraudulent conveyance claims are the property of the debtors' estate. See In re MortgageAmerica Corp., 714 F.2d 1266, 1275-76 (5th Cir. 1983); Matter of Fletcher, 176 B.R. 445, 452 (Bankr. W.D. Mich. 1995), rev'd and remanded on other grounds sub nom. In re Van Orden, No. 1:95-CV-79, 1995 WL 17903731 (W.D. Mich. Sept. 5, 1995). Some do not mention Section 362(a) and rely on the need to protect trustees' et al. powers to bring Section 544 avoidance actions. See In re Van Diepen, P.A., 236 F. App'x. 498, 502-03 (11th Cir. 2007); In re Clark, 374 B.R. 874, 876 (Bankr. M.D. Ala. 2007); In re

Tessmer, 329 B.R. 776, 780 (Bankr. M.D. Ga. 2005). All the caselaw agrees that the trustee et al.'s powers under Section 544 are exclusive, at least until the stay is lifted or the two-year period expires.

Equally important is the fact that the inference of a reversion of fraudulent conveyance claims to creditors drawn from Section 544's statute of limitations is not based on the language of the Code, which says nothing about the reversion of claims vested in the trustee et al. by Section 544. Statutes of limitation usually are intended to limit the assertion of stale claims and to provide peace to possible defendants, Converse v. Gen. Motors Corp., 893 F.2d 513, 516 (2d Cir. 1990), and not to change the identity of the authorized plaintiffs without some express language to that effect. A decisive part of appellants' legal theory thus has no support in the language of the Code.

Even if this gap is assumed not to exist, or can be otherwise traversed, appellants' theory encounters other serious problems. Section 544, vesting avoidance powers in the trustee et al., is intended to simplify proceedings, reduce the costs of marshalling the debtor's assets, and assure an equitable distribution among the creditors. See In re MortgageAmerica Corp., 714 F.2d 1266, 1275-76 (5th Cir. 1983) (noting that "[t]he 'strong arm' provision of the [Bankruptcy]

Code, 11 U.S.C. § 544, allows the bankruptcy trustee to step into the shoes of a creditor for the purpose of asserting causes of action under state fraudulent conveyance acts for the benefit of all creditors, not just those who win a race to judgment" and Section 362 helps prevent "[a]ctions for the recovery of the debtor's property by individual creditors under state fraudulent conveyance laws [that] would interfere with [the bankruptcy] estate and with the equitable distribution scheme dependent upon it"). However, these purposes are hardly consistent with the process hypothesized by appellants.

Accepting for purposes of argument appellants' view of the applicable process, Section 362, at the very least, prevented appellants (for a time) from bringing their state law, fraudulent conveyance claims, while Section 546(e) barred the Committee from seeking to enforce or, necessarily, to settle them. Appellants' argument thus seems to posit that their claims are on hold until the trustees et al. decide whether to bring an action they are powerless to bring or to pass on to creditors a power they do not have. In short, it assumes that, when creditors' avoidance claims are lodged in the trustee et al. and are diminished in that hand by the Code, they reemerge in undiminished form in the hands of

creditors after the statute of limitations governing actions by the trustee et al. has run or the bankruptcy court lifts the automatic stay.

In the context of the Code, however, any such process is a glaring anomaly. Section 548(a)(1)(A) vests trustees with a federal claim to avoid the very transfers attacked by appellants' state law claims –- but only on an intentional fraud theory. There is little apparent reason to limit trustees et al. to intentional fraud claims while not extinguishing constructive fraud claims but rather leaving them to be brought later by individual creditors. In particular, enforcement of the intentional fraud claim is undermined if creditors can later bring state law, constructive fraudulent conveyance claims involving the same transfers. Any trustee would have grave difficulty negotiating more than a nominal settlement in the federal action if it cannot preclude state claims attacking the same transfers but not requiring a showing of actual fraudulent intent. Unable to settle, a trustee et al. will be reluctant to expend the estate's resources on vigorously pursuing the federal claim while awaiting the stayed state claims to revert and to be litigated by creditors. As happened in the present matter, the result is that the trustee et al.'s action awaits the pursuit of piecemeal actions by creditors. This is precisely opposite of the intent of the Code's procedures. While a bankruptcy

court can reduce the delay by an early lifting of the automatic stay with regard to constructive fraudulent conveyance actions, that action would underline the anomaly of applying the stay to the bringing of claims that are barred to trustees et al.

Staying ordinary state law, constructive fraudulent conveyance claims by individual creditors while the trustee deliberates is a rational method of avoiding piecemeal litigation and ensuring an equitable distribution of assets among creditors. See MBNA Am. Bank, N.A. v. Hill, 436 F.3d 104, 108 (2d Cir. 2006) ("The objectives of the Bankruptcy Code . . . include . . . 'the need to protect creditors and reorganiz[e] debtors from piecemeal litigation . . . .'") (quoting Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp., 118 F.3d 1056, 1069 (5th Cir. 1997)). However, the scheme described by appellants does not resemble this method either in simplicity or in the equitable treatment of creditors.

To rationalize these anomalies, appellants speculate as to -- more accurately, imagine -- a deliberate balancing of interests by Congress. They argue that Congress wanted to balance the need for certainty and finality in securities markets, recognized in Section 546(e), against the need to maximize creditors'

recoveries, recognized in various other provisions. Congress did so, they argue, by limiting only the avoidance powers of trustees et al., not those of individual creditors (save for the stay), in Section 546(e) because actions by trustees et al. are a greater threat to securities markets than are actions by individual creditors. Resp. & Reply Br. of Pls.-Appellants-Cross-Appellees 71. That greater threat results from the fact that a trustee's power of avoidance is funded by the debtor's estate, see 11 U.S.C. §§ 327, 330, supported by national long-arm jurisdiction, see Fed. R. Bankr. P. 7004(d),(f), and can be used to avoid the entirety of a transfer, Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.), 464 B.R. 606, 615-17 (Bankr. S.D.N.Y. 2012) (citing Moore v. Bay, 284 U.S. 4 (1931)). Creditors, in turn, have no such funding, are limited by state jurisdictional rules, and can sue only for their individual losses. See In re Integrated Agri, Inc., 313 B.R. 419, 428 (Bankr. C.D. Ill. 2004). Therefore, appellants argue that a deliberate "balance" was struck by protecting securities markets from trustees' et al. actions while subjecting them to the lesser disruption individual creditors' actions might cause after a two-year stay. Resp. & Reply Br. of Pls.-Appellants-Cross-Appellees 83-85. For a court to upset this delicate balance would constitute judicial intrusion on policy decisions rightfully left to the Congress.

However, the balance described above is an ex post explanation of a legal scheme that appellants must first construct, and then justify as rational, because it is essential to their claims. Although they argue that the scheme was deliberately constructed by Congress, that argument lacks any support whatsoever in the legislative deliberations that led to Section 546(e)'s enactment.

Moreover, appellants' arguments understate the number of creditors who would sue, if allowed, and the corresponding extent of the danger to securities markets. Creditors may assign their claims and various methods of aggregation can lead to billions of dollars of claims, as here.

(iii) No Plain Meaning

These issues reflect ambiguities as to exactly what is transferred to trustees et al. by Section 544(b)(1). It is clear that trustees et al. own the debtors' estates, which include the debtors' property and legal claims. See 11 U.S.C. § 541(a)(1) (Among other things, the "estate is comprised of . . . all legal or equitable interests of the debtor in property as of the commencement of the case"); U.S. ex rel. Spicer v. Westbrook, 751 F.3d 354, 361-62 (5th Cir. 2014) ("The phrase 'all legal or equitable interests' includes legal claims -- whether based on state or federal law."). Avoidance claims belong to creditors, however, and whether they

50

become the property of the debtors' estates is a debated, and somewhat metaphysical, issue. The issue does have a limited practical bearing on the present matter, however. If the claims asserted by appellants became the property of the debtor's estate upon Tribune's bankruptcy and were thereby limited in the hands of the Committee, their reversion in an unaltered form, whether occurring automatically or by act of the Committee or bankruptcy court, might seem counterintuitive.

Appellants' reliance on the applicability of the automatic stay to their claims would arguably support the "property" view. The stay is intended in part to protect the property rights of the trustee et al. in the debtor's estate. Subjecting avoidance actions by creditors to the stay has been supported by various courts on the ground that such claims are either the property of the debtor's estate or have an equivalent legal status. See In re MortgageAmerica Corp., 714 F.2d 1266, 1275-76 (5th Cir. 1983); In re Swallen's, Inc., 205 B.R. 879, 882 (Bankr. S.D. Ohio 1997); Matter of Fletcher, 176 B.R. 445, 452 (Bankr. W.D. Mich. 1995).

Whether, and to what degree, fraudulent conveyance claims become the property of a bankrupt estate was, at the time of Section 546(e)'s enactment, and now, anything but clear. The principal Supreme Court precedent held that such

claims are the property of the debtor's estate.  Trimble v. Woodhead, 102 U.S. 647, 649 (1880).  It is a very old decision but has not been expressly overruled.  Subsequent court of appeals decisions are bountiful in contradictory statements regarding the property issue.  Compare In re Cybergenics Corp., 226 F.3d 237, 241, 246 (3d Cir. 2000) (stating that "fraudulent transfer claims have long belonged to a transferor's creditors, whose efforts to collect their debts have essentially been thwarted as a consequence of the transferor's actions" but also noting that the debtor's "'assets' and 'property of the estate' have different meanings, evidenced in part by the numerous provisions in the Bankruptcy Code that distinguish between property of the estate and property of the debtor, or refer to one but not the other"), and Picard v. Fairfield Greenwich Ltd., 762 F.3d 199, 212 (2d Cir. 2014) ("Our case law is clear that assets targeted by a fraudulent conveyance action do not become property of the debtor's estate under the Bankruptcy Code until the Trustee obtains a favorable judgment."), with Cumberland Oil Corp. v. Thropp, 791 F.2d 1037, 1042 (2d Cir. 1986) (noting that causes of action alleging violation of fraudulent conveyance laws would be property of the estate), and Nat'l Tax Credit Partners v. Havlik, 20 F.3d 705, 708-09 (7th Cir. 1994) ("[T]he right to recoup a fraudulent conveyance, which outside

52

of bankruptcy may be invoked by a creditor, is property of the estate that only a trustee or debtor in possession may pursue once a bankruptcy is underway.").

Use of the term "property" as a short-hand way of suggesting exclusivity has merit, Henry E. Smith, Property and Property Rules, 79 N.Y.U. L. Rev. 1719, 1770-74 (2004), but Section 544(b)(1) does not expressly state whether the bundle of rights transferred can revert. However, we need not resolve either the "property" or the reversion issues. Whether the statutory language has a plain meaning turns on whether a consensus would have existed among reasonable, contemporaneous readers as to meaning of that language in the particular statutory context. See Pettus v. Morgenthau, 554 F.3d 293, 297 (2d Cir. 2009) ("[W]e attempt to ascertain how a reasonable reader would understand the statutory text, considered as a whole."); Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist., 541 U.S. 246, 252-53 (2004) (noting that "[s]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose") (quoting Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985)). If differing views as to meaning were reasonable at the time of

Section 546(e)'s enactment, its meaning is less than plain.  See, e.g., Rodriguez v. Cuomo, 953 F.2d 33, 39-40 (2d Cir. 1992).

Appellants' arguments on meaning rely not only on the reference to a trustee's et al. powers but equally, or more so, on a claim of settled law at the time of Section 546(e)'s enactment that creditors' avoidance rights not only revert to creditors but also revert in their original breadth.  However, whether fraudulent conveyance claims revert as a matter of law upon a trustee's failure to act was, both at the time Section 546(e) was passed as well as now, unclear, as discussed supra.  A contemporaneous reader would not, therefore, necessarily have believed it plain that Section 546(e)'s reference only to a trustee's et al. avoidance claim meant that creditors could bring their own claims.[14]

A contemporaneous reader would also notice that the language of the automatic stay provision does not literally apply to appellants' actions and that no provision for the reversion of claims vested in the trustee et al. by Section 544 exists.  As explained supra, having to draw an inference of reversion of rights from that provision's statute of limitations might well have appeared as a leap several bridges too far to such a reader.  Indeed, the vesting of avoidance claims

---

[14] Our task of determining how a contemporaneous reader would have read Section 546(e) does not depend on the caselaw of one particular circuit.

54

in the trustee et al., the lack of applicable language in the automatic stay

provision, and the lack of a statutory basis for reversion might well have

suggested to such a reader that Section 544's vesting of avoidance proceedings in

the trustee et al. cut off creditors from any avoidance rights other than a share of

the proceeds in bankruptcy.

Even passing these obstacles, the structure of the Code and the relationship

of its pertinent sections might have suggested to a contemporaneous reader that

altered rights do not revert to creditors unaltered, or to put it another way, a

trustee et al. cannot pass on, or "allow" to revert through passivity, a right the

trustee et al. does not have.  To be sure, contemporaneous readers might have

taken other views, including those of appellants, but that is the very definition of

ambiguity.

(iv) Conclusion

We need not resolve these issues or even hold that the lack of statutory

support, ambiguities, anomalies, or conflicts with purposes of the Code are

sufficient to support a preemption holding.  They are sufficient, however, to

dispel the suggestions found in some discussions of these issues of a clear textual

basis for appellants' theory in the Code and an overall consistency with

congressional purpose. See In re Lyondell Chem. Co., 503 B.R. 348, 358-59 (Bankr. S.D.N.Y. 2014) as corrected (Jan. 16, 2014); In re: Tribune Co. Fraudulent Conveyance Litig., 499 B.R. at 315. We also need not issue a decision that affects fraudulent conveyance actions brought by creditors whose claims are not subject to Section 546(e). Our ensuing discussion concludes that the purposes and history of that Section necessarily reflect an intent to preempt the claims before us. We turn now to the conflict between those claims and Section 546(e).

5. Conflict with Section 546(e)

As discussed supra, the meaning of Section 546(e) with regard to appellants' rights to bring the actions before us is ambiguous. We must, therefore, look to its language, legislative history, and purposes to determine its effect. Marvel Characters, Inc. v. Simon, 310 F.3d 280, 290 (2d Cir. 2002). Every congressional purpose reflected in Section 546(e), however narrow or broad, is in conflict with appellants' legal theory. Their claims are, therefore, preempted.

Section 546(e) was intended to protect from avoidance proceedings payments by and to commodities and securities firms in the settlement of securities transactions or the execution of securities contracts. The method of settlement through such entities is essential to securities markets. Payments by

and to such entities provide certainty as to each transaction's consummation, speed to allow parties to adjust the transaction to market conditions, finality with regard to investors' stakes in firms, and thus stability to financial markets. See H.R. Rep. No. 97-420 (1982); H.R. Rep. No. 95-595 (1977). Unwinding settled securities transactions by claims such as appellants' would seriously undermine -- a substantial understatement -- markets in which certainty, speed, finality, and stability are necessary to attract capital. To allow appellants' claims to proceed, we would have to construe Section 546(e) as achieving the opposite of what it was intended to achieve.

Allowing creditors to bring claims barred by Section 546(e) to the trustee et al. only after the trustee et al. fails to exercise powers it does not have would increase the disruptive effect of an unwinding by lengthening the period of uncertainty for covered entities and investors. Indeed, the idea of preventing a trustee from unwinding specified transactions while allowing creditors to do so, but only later, is a policy in a fruitless search of a logical rationale.

The narrowest purpose of Section 546(e) was to protect other-commodities and securities firms from avoidance claims seeking to unwind a bankrupt commodities or securities firm's transactions that consummated transfers

between customers.  See H.R. Rep. No. 97-420, at 1 (1982) ("The commodities and securities markets operate through a complex system of accounts and guarantees. Because of the structure of the clearing systems in these industries and the sometimes volatile nature [of] the markets, certain protections are necessary to prevent the insolvency of one commodity or security firm from spreading to other firms and possibl[y] threatening the collapse of the affected market.").  It must be emphasized that appellants' legal theory would clearly allow such claims to be brought (later) by creditors of the bankrupt firm.  Even the narrowest purpose of Section 546(e) is thus at risk.

Some judicial and other discussions of these issues avoid addressing the full effects of adopting appellants' arguments.  See In re Lyondell Chem. Co., 503 B.R. 348, 359-78 (Bankr. S.D.N.Y. 2014) as corrected (Jan. 16, 2014).  Such analysis always begins by reliance on the "trustee" language, id. at 358, but then narrows the scope of the transfers covered by Section 546(e)'s language.  For example, appellants argue that the concerns of the amicus curiae Securities and Exchange Commission regarding the effect of the district court's decision on the securities markets are misplaced, because appellants are not seeking money from the

intermediaries.[15]  Resp. & Reply Br. of Pls.-Appellants Cross-Appellees 78-82.  In

doing so, they rely upon the Lyondell opinion, which, after relying on the

"trustee" language, held that Section 546(e) is not preemptive of state law,

fraudulent conveyance actions involving LBOs because such actions do not

implicate the purposes of Section 546(e).  503 B.R. at 372-73.

There is no little irony in putting lynchpin reliance on the word "trustee"

while ignoring the language that follows.  In any event, for the reasons stated

above, Section 546(e)'s language is broad enough under certain circumstances to

cover a bankrupt firm's LBO payments even where, as here, that firm's business

was primarily commercial in nature.  11 U.S.C. § 546(e) (limitations on avoidance

of transfers made by a "customer" of a financial institution "in connection with a

securities contract").  A search for legislative purpose is heavily informed by

language, and analyzing all the language of a provision and its relationship to the

Code as a whole is preferable to using literalness here and perceived legislative

purpose (without regard to language) where as needed to reach particular

---

[15] Under the "Collapsing Doctrine," "[c]ourts analyzing the effect of LBOs have routinely analyzed them by reference to their economic substance, 'collapsing' them, in many cases, to consider the overall effect of multi-step transactions."  In re Lyondell Chem. Co., 503 B.R. 348, 354, 379 (Bankr. S.D.N.Y. 2014) as corrected (Jan. 16, 2014).  Monies passed through intermediaries are deemed to be the property only of the ultimate recipients, here the cashed out shareholders.

59

results.  See King v. Burwell, 135 S. Ct. 2480, 2489 (2015) ("[O]ftentimes the meaning -- or ambiguity -- of certain words or phrases may only become evident when placed in context.  So when deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme.  Our duty, after all, is to construe statutes, not isolated provisions.") (internal quotation marks and citations omitted).

We do not dwell on this because we perceive no conflict between Section 546(e)'s language and its purpose.  Section 546(e) is simply a case of Congress perceiving a need to address a particular problem within an important process or market and using statutory language broader than necessary to resolve the immediate problem.  Such broad language is intended to protect the process or market from the entire genre of harms of which the particular problem was only one symptom.  The legislative history of Section 546(e) clearly reveals such a purpose.  That history (confirmed by the broad language adopted) reflects a concern over the use of avoidance powers not only after the bankruptcy of a commodities or securities firm, but also after a "customer" or "other participant" in the securities markets enters bankruptcy.  See H.R. Rep. No. 97-420 (1982).  To be sure, the examples used by the Section's proponents focused on the immediate

concern of creditors of bankrupt brokers seeking to unwind payments by the bankrupt firm to other brokers.  Id.  Such actions were perceived as creating a danger of "a ripple effect," id., a chain of bankruptcies among brokers disrupting the securities market generally.  From these examples, appellants, and others, have argued that when monetary damages are sought only from shareholders, or an LBO is involved, the purposes of Section 546(e) are not implicated.  See Resp. & Reply Br. of Pls.-Appellants-Cross-Appellees 79; In re Lyondell, 503 B.R. at 358-59.  Even apart from using the oil and water mixture of applying a narrow literalness to the word "trustee" and disregarding the rest of the Section's language, we disagree.

As courts have recognized, Congress's intent to "minimiz[e] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries," Quebecor, 719 F.3d at 100 (quoting Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V., 651 F.3d 329, 333 (2d Cir. 2011)), reflected a larger purpose memorialized in the legislative history's mention of bankrupt "customers" or "other participant[s]" and in the broad statutory language defining the transactions covered.  That larger purpose was to "promot[e] finality . . . and certainty" for investors, by limiting the circumstances,

61

e.g., to cases of intentional fraud, under which securities transactions could be unwound. In re Kaiser Steel Corp., 952 F.2d 1230, 1240 n.10 (10th Cir. 1991) (quoting H. Rep. No. 484, 101st Cong. 2d Sess. 2 (1990), reprinted in 1990 U.S.C.C.A.N. 223, 224).

The broad language used in Section 546(e) protects transactions rather than firms, reflecting a purpose of enhancing the efficiency of securities markets in order to reduce the cost of capital to the American economy. See Bankruptcy of Commodity and Securities Brokers: Hearings Before the Subcomm. on Monopolies and Commercial Law of the Comm. on the Judiciary, 47th Cong. 239 (1981) (statement of Bevis Longstreth, Commissioner, SEC) (explaining that, without 546(e), the Bankruptcy Code's "preference, fraudulent transfer and stay provisions can be interpreted to apply in harmful and costly ways to customary methods of operation essential to the securities industry"). As noted, central to a highly efficient securities market are methods of trading securities through commodities and securities firms. Section 546(e)'s protection of the transactions consummated through these entities was not intended as protection of politically favored special interests. Rather, it was sought by the SEC –- and corresponding provisions by the CFTC, see Bankruptcy Act Revision: Hearings on H.R. 31 and

H.R. 32 Before the Subcomm. on Civil & Constitutional Rights of the H. Comm. on the Judiciary, 94th Cong., Supp. App. Pt. 4, 2406 (1976) -- in order to protect investors from the disruptive effect of after-the-fact unwinding of securities transactions.

A lack of protection against the unwinding of securities transactions would create substantial deterrents, limited only by the copious imaginations of able lawyers, to investing in the securities market. The effect of appellants' legal theory would be akin to the effect of eliminating the limited liability of investors for the debts of a corporation: a reduction of capital available to American securities markets.

For example, all investors in public companies would face new and substantial risks, if appellants' theory is adopted. At the very least, each would have to confront a higher degree of uncertainty even as to the consummation of securities transfers. The risks are not confined to the consummation of securities transactions. Pension plans, mutual funds, and similar institutional investors would find securities markets far more risky if exposed to substantial liabilities derived from investments in securities sold long ago. If appellants were to prevail, a pension plan whose position in a firm was cashed out in a merger

63

might have to set aside reserves in case the surviving firm went bankrupt and triggered avoidance actions based on a claim that the cash out price exceeded the value of the shares.  Every economic downturn could expose such institutional investors not only to a decline in the value of their current portfolios but also to claims for substantial monies received from mergers during good times.

Given the occasional volatility of economic events, any transaction buying out shareholders would risk being attacked as a fraudulent conveyance avoidable by creditors if the firm faltered.  Appellants' legal theory could even reach investors who, after voting against a merger approved by other shareholders, were involuntarily cashed out.  Tender offers, which almost always involve a premium above trading price, Lynn A. Stout, <u>Are Takeover Premiums Really Premiums?  Market Price, Fair Value, and Corporate Law</u>, 99 Yale L.J. 1235, 1235 (1990), would imperil cashed out shareholders if the surviving entity encountered financial difficulties.

If appellants' theory was adopted, individual investors following a conservative buy-and-hold strategy with a diversified portfolio designed to reduce risk might well decide that such a strategy would actually increase the risk of crushing liabilities.  Such a strategy is adopted because it involves low

costs of monitoring the prospects of individual companies and emphasizes the

offsetting of unsystematic risks by investing in multiple firms.  See Leigh v.

Engle, 858 F.2d 361, 368 (7th Cir. 1988).  Appellants' legal theory might well

require costly and constant monitoring by investors to rid their portfolios of

investments in firms that might, under then-current circumstances, be subject to

mergers, stock buy-backs, or tender offers (and would otherwise be good

investments).  Investing in multiple companies, the essence of diversification,

would increase the danger of avoidance liability.

The threat to investors is not simply losing a lawsuit.  Given the costliness

of defending such legal actions and the long delay in learning their outcome,

exposing investors to even very weak lawsuits involving millions of dollars

would be a substantial deterrent to investing in securities.  The need to set aside

reserves to meet the costs of litigation -- not to mention costs of losing -- would

suck money from capital markets.

As noted, concern has been expressed that LBOs are different from other

transactions in ways pertinent to the Bankruptcy Code.  In re Lyondell Chem.

Co., 503 B.R. 348, 354, 358-59 (Bankr. S.D.N.Y. 2014), as corrected (Jan. 16, 2014).

However, the language of Section 546(e) clearly covers the LBO payments at issue here for the reasons stated above.

Moreover, securities markets are heavily regulated by state and federal governments. The statutory supplements used in law school securities regulation courses are thick enough to rival Kevlar in stopping bullets. Mergers and tender offers are among the most regulated transactions. See, e.g., Williams Act, 15 U.S.C.A. §§ 78m(d)-(e), 78n(d). Much of the content of state and federal regulation is designed to protect investors in such transactions. Much of that content is also designed to maximize the payout to shareholders cashed out in a merger, see, e.g., Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173, 182 (Del. 1986); Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 955-56 (Del. 1985), or accepting a tender offer, see Williams Act, 15 U.S.C.A. §§ 78m(d)-(e), 78n(d). Appellants' legal theory would allow creditors to seek to portray that maximization as evidence supporting a crushing liability. A legal rule substantially undermining those goals of state and federal regulation –- again, one akin to eliminating limited liability –- is a systemic risk.

It is also argued that the Bankruptcy Code has many different purposes and that Section 546(e) does not clearly "trump[] all [the] other[s]." In re Tribune

66

<u>Co. Fraudulent Conveyance Litig.</u>, 499 B.R. 310, 317 (S.D.N.Y. 2013). The pertinent -- and "trumping" -- "other" purpose of the Code is said to be the maximization of assets available to creditors. <u>Id.</u> Courts customarily accommodate statutory provisions in tension with one another where the principal purpose of each is attainable by limiting each in achieving secondary goals. <u>See, e.g.</u>, <u>In re Colonial Realty Co.</u>, 980 F.2d 125, 132 (2d Cir. 1992). However, Section 546(e) is in full conflict with the goal of maximizing the assets available to creditors. Its purpose is to protect a national, heavily regulated market by limiting creditors' rights. Conflicting goals are not accommodated by giving value with the right hand and taking it away with the left. Section 546(e) cannot be trumped by the Code's goal of maximizing the return to creditors without thwarting the Section's purposes.

6.  Additional Considerations Regarding Congressional Intent

We therefore conclude that Congress intended to protect from constructive fraudulent conveyance avoidance proceedings transfers by a debtor in bankruptcy that fall within Section 546(e)'s terms. As discussed supra, appellants' theory hangs on the ambiguous use of the word "trustee," has no basis in the language of the Code, leads to substantial anomalies, ambiguities and

67

conflicts with the Code's procedures, and, most importantly, is in irreconcilable conflict with the purposes of Section 546(e).  In this regard, we do not ignore Section 544(b)(2), which prohibits avoidance of a transfer to a charitable contribution by a trustee but also expressly preempts state law claims by creditors.  It states:  "Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case."  11 U.S.C. § 544(b)(2).  Appellants rely heavily upon this provision to argue that, while Congress knew how to explicitly preempt state law in the Bankruptcy Code, it chose not to do so in the context of Section 546(e).

Appellants' argument suffers from a fatal flaw, however.  In <u>Arizona v. United States</u>, the Supreme Court made clear that "the existence of an express pre-emption provisio[n] does <u>not</u> bar the ordinary working of conflict pre-emption principles or impose a special burden that would make it more difficult to establish the preemption of laws falling outside the clause."  132 S. Ct. 2492, 2504-05 (2012) (quotation marks and citations omitted); <u>see also</u> <u>Hillman</u>, 133 S. Ct. at 1954 ("[W]e have made clear that the existence of a separate pre-emption provision does <u>not</u> bar the ordinary working of conflict pre-emption principles.")

(internal quotation marks and citations omitted).  Section 544(b)(2) does not, therefore, undermine our conclusion as to Congress's intent.

Next, appellants argue that Congress's failure to amend Section 546(e) over the years that it has existed in pertinent form reflects a congressional intent to allow their actions to proceed.  In support, they point only to requests for an amendment by the Chair of the CFTC and by Comex, see Bankruptcy Act Revision:  Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil & Constitutional Rights of the H. Comm. on the Judiciary, 94th Cong., Supp. App. Pt. 4, 2406 (1976); Bankruptcy Reform Act:  Hearings on S. 2266 and H.R. 8000 Before the Subcomm. on Improvements in Judicial Machinery of the S. Comm. on the Judiciary, 95th Cong. 1297 (1978), the enactment of Section 544(b)(2) with an express preemption provision, and a decision in the District of Delaware, PHP Liquidating, LLC v. Robbins, 291 B.R. 603, 607 (D. Del. 2003), aff'd sub nom. In re PHP Healthcare Corp., 128 F. App'x 839 (3d Cir. 2005).

To be sure, a history of relevant practice may support an inference of congressional acquiescence.  See, e.g., Fiero v. Fin. Indus. Regulatory Auth., 660 F.3d 569, 577 (2d Cir. 2011) (noting that FINRA's "longstanding reliance" on enforcement mechanisms other than fines -- and Congress's failure to alter

69

FINRA's enforcement powers -- "indicates that FINRA is not authorized to enforce the collection of its fines through the courts"); Am. Tel. & Tel. Co. v. M/V Cape Fear, 967 F.2d 864, 872 (3d Cir. 1992) ("The Supreme Court in the past has implied private causes of action where Congress, after a 'consensus of opinion concerning the existence of a private cause of action' had developed in the federal courts, has amended a statute without mentioning a private remedy.") (quoting Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 380 (1982)). However, the effect or meaning of legislation is not to be gleaned from isolated requests for more protective, but possibly redundant, legislation. The impact of Section 544(b)(2) is discussed immediately above and need not be repeated here.

Finally, the failure of Congress to respond to court decisions is of interpretive significance only when the decisions are large in number and universally, or almost so, followed. See Merrill Lynch, 456 U.S. at 379 (holding that congressional amendment of the Commodity Exchange Act that was silent on the subject of private judicial remedies did not overturn federal court decisions routinely and consistently [] recogniz[ing] an implied private cause of action") (emphasis added); see also Touche Ross & Co. v. Redington, 442 U.S.

560, 577 n.19 (1979) (holding that the Supreme Court's implication of a private right of action under § 10(b) of the Securities and Exchange Act of 1934 was simply acquiescence in "the 25-year-old acceptance by the lower federal courts of an implied action"). The present decision is far from a departure from a generally accepted understanding. The district court decision in this very case and the bankruptcy court decision in Lyondell are in fact the sole extensive judicial discussions of the issue. Indeed, our present decision does not even constitute a split among the circuits. As or more telling with regard to the existence of a general understanding or a need for action, we find no history of the use of state law, constructive fraudulent conveyance actions to unwind settled securities transactions, either after a bankruptcy or in its absence.

The Constitution's establishment of two legislative branches that must act jointly and with the executive's approval was designed to render hasty action possible only in circumstances of widely perceived need. Congress's failure to act must be viewed in that context, and reliance upon an inference of satisfaction with the status quo must at least be based on evidence of a long-standing and recognized status quo. In the present matter, we cannot draw the suggested

71

inference on the basis of the skimpy evidence submitted while the inference of a preemptive intent is easily drawn.

7. The Relevance of <u>Merit Mgmt.</u> to this Preemption Holding

Appellants finally contend that this preemption holding "cannot be reconciled" with the Supreme Court's decision in <u>Merit Mgmt</u>. Appellants' Motion to Recall the Mandate at 10. Again, we disagree. As an initial matter, the <u>Merit Mgmt.</u> Court was not tasked with assessing Section 546(e)'s preemptive force, and it did not address preemption. Instead, the sole issue in <u>Merit Mgmt.</u> was whether, "in the context of a transfer that was executed via one or more transactions," the relevant transfer for the purposes of Section 546(e) was the overarching transfer or any of its component transfers. <u>Merit Mgmt.</u>, 138 S. Ct. at 888. Accordingly, <u>Merit Mgmt.</u> does not control our disposition of the preemption issue.

Nor have we located anything in <u>Merit Mgmt.</u>'s reasoning that contradicts our assessment of Congress's preemptive intent. Appellants suggest that the Supreme Court rejected a primary premise upon which we have relied here: that Section 546(e) was intended to promote "'finality' in the securities markets." Appellants' Motion to Recall the Mandate at 10-11. The Court did no such thing,

however. Instead, it merely concluded that, to the extent the policies animating Section 546(e) were relevant for determining the safe harbor's scope, those policies did not supply a basis for "deviat[ing] from the plain meaning of the language used in § 546(e)." Merit Mgmt., 138 S. Ct. at 897; see also id. at 888 ("The Court concludes that the plain meaning of § 546(e) dictates that the only relevant transfer for purposes of the safe harbor is the [overarching] transfer that the trustee seeks to avoid.").

Also, the failures of the "purposivist arguments" in Merit Mgmt., id. at 897, are not particularly instructive here due to the distinctions between the inquiries here and there. The Supreme Court has repeatedly held that where, as in Merit Mgmt., courts are interpreting the meaning of a statutory provision, they should not allow extrinsic evidence of Congressional purpose to alter the plain meaning of the statute. See, e.g., Henson v. Santander Consumer USA Inc., 137 S. Ct. 1718, 1725 (2017) ("[I]t is quite mistaken to assume . . . that whatever might appear to further the statute's primary objective must be the law.") (internal quotation marks and alterations omitted); Dodd v. United States, 545 U.S. 353, 357 (2005) ("We must presume that the legislature says in a statute what it means and means in a statute what it says there.") (internal quotation marks and alterations

omitted).  But where, as here, we are assessing whether a statute preempts certain claims, we have been directed to consult evidence of Congressional purpose to ascertain whether the statute has a preemptive effect beyond that provided by its plain terms.  See, e.g.,  Altria Grp., Inc. v. Good, 555 U.S. 70, 76 (2008) ("Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose. [Even where] a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains.") (internal citations omitted) (emphasis added).  Thus, in light of these different directives, it is clear that a "purposivist" argument should carry far more weight in this case than in Merit Mgmt.

Finally, it bears emphasizing that the other reasons underpinning our preemption holding are not implicated by Merit Mgmt. in any way.  Specifically, Merit Mgmt. does not contradict our findings that appellants' legal theory has no support in the language of the Code; leads to substantial anomalies and conflicts with the Code's procedures; and requires reading Section 546(e)'s reference to a trustee et al. avoidance claim to mean that creditors could bring their own claims — a reading that is less than plain.

For these reasons, we find that our preemption holding is consistent with Merit Mgmt.

## CONCLUSION

For the reasons stated, we affirm the dismissal of appellants' claims, on preemption rather than standing grounds. We resolve no issues regarding the rights of creditors to bring state law, fraudulent conveyance claims not limited in the hands of a trustee et al. by Code Section 546(e) or by similar provisions such as Section 546(g), which was at issue in an appeal heard in tandem with the present matter, see Whyte v. Barclays Bank PLC, 644 F. App'x 60, 60 (2d Cir. 2016) (affirming the district court's dismissal of state law, fraudulent conveyance claims limited by Section 546(g) "for substantially the reasons stated in [Tribune I]"), cert. denied, 137 S. Ct. 2114 (2017).